# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF ARKANSAS
# FAYETTEVILLE DIVISION

| | |
|---|---|
| **Shared Memory Graphics LLC,** | |
| **Plaintiff,** | Case No.:  5:09cv5128 BSM |
| **v.** | Hon. Brian S. Miller |
| **Apple Inc.,** *et al.,* | |
| **Defendants.** | |
| **and Related Counterclaims** | |

## APPENDIX OF EVIDENCE IN SUPPORT MOTION TO DISQUALIFY FLOYD & BUSS LLP AS COUNSEL FOR SHARED MEMORY GRAPHICS LLC

Nintendo of America Inc., and Nintendo Co., Ltd. (collectively "Nintendo") hereby submit an appendix of evidence in support of its Motion to Disqualify Floyd & Buss LLP as Counsel for Shared Memory Graphics LLC filed herewith.

1.   Attached hereto at page 4 is the Wikipedia entry for "Hollywood (graphics chip),"
     http://en.wikipedia.org/wiki/Hollywood_(graphics_chip).

2.   Attached hereto at page 5 is Kent Cooper's Floyd & Buss Firm Bio,
     http://www.fblawllp.com/.

3.   Attached hereto at pages 6-17 is the Complaint for Patent Infringement in *Advanced Micro Devices, Inc. v. Samsung Elect. Co.*, No. CV-08-0986 at Dkt. # 1, (N.D. Cal. Feb. 19, 2008).

4.   Attached hereto at pages 18-19 is the Declaration of Adam Floyd in *Oki America, Inc. v. Advanced Micro Devices, Inc.*, No. C04-3171 at Dkt. # 348 (N.D. Cal. August 25, 2006).

5.   Attached hereto at pages 20-21 is the Order Granting Application of Attorney H. Kenneth Prol *Pro Hac Vice* in *Oki America, Inc. v. Advanced Micro Devices, Inc.*, No. C04-3171 at Dkt. # 95 (N.D. Cal. August 16, 2005).

6.   Attached hereto at pages 22-23 is the Notice of Appearance of  Adam V. Floyd on behalf of AMD in *Microline, LLC v. Intel Corp.*, No. 07-CV-488 at Dkt. # 87 (E.D. Tex. March 7, 2008).

7.   Attached hereto at pages 24-25 is the Notice of Appearance of  H. Kenneth Prol on behalf of AMD in *Microline, LLC v. Intel Corp.*, No. 07-CV-488 at Dkt. # 88 (E.D. Tex. March 7, 2008).

8.   Attached hereto at pages 26-29 is a copy of SMG's Notice of Rule 30(b)(6) Deposition to Nintendo of America Inc., served January 11, 2010.

9.   Attached hereto at pages 30-34 is the Complaint in *Lonestar Inventions, LP v. Nintendo of Am. Inc.*, No. 6:07-CV-261 at Dkt. # 1 (E.D. Tex. June 7, 2007).

APPENDIX OF EVIDENCE IN SUPPORT OF MOTION TO DISQUALIFY

10.    Attached hereto at pages 35-38 is the Complaint in *Lonestar Inventions, LP v. Advanced Micro Devices, Inc.*, No. 6:09-CV-0017 at Dkt. # 1 (E.D. Tex. January 8, 2009).

11.    Attached hereto at page 39 is the Order Granting Dismissal in *Lonestar Inventions, LP v. Nintendo of Am. Inc.*, No. 6:07-CV-261 at Dkt. # 104 (E.D. Tex. July 20, 2009).

12.    Attached hereto at pages 40-45 is a copy of the ABA Comm. on Ethics and Prof'l Responsibility, "Representation Adverse to Organization by Former In-House Lawyer," Formal Op. 99-415 (1999).

13.    Attached hereto at pages 46-48 is a copy of the ABA Comm. on Ethics and Prof'l Responsibility, "Informed Consent to Future Conflicts of Interest," Formal Op. 05-436 (2005).

14.    Attached hereto at pages 49-51 is a copy of the Washington State Bar Ass'n, "Advanced waiver of conflicts of interest," Informal Op. 2064 (2004).

15.    Attached hereto at pages 52-62 is a copy of the Order Granting Motion to Disqualify Counsel in *Openwave Sys. v. 724 Solutions Inc.*, No. 09-3511 (N.D. Cal. April 22, 2010).


Respectfully submitted,

Dated:  April 27, 2010,

| By: /s/ Grant Kinsel | By: /s/ Marshall S. Ney |
|---|---|
| Grant E. Kinsel (SBN 172407) (*pro hac vice*) | Marshall S. Ney |
| Joseph P. Hamilton (SBN 211544) (*pro hac vice*) | **MITCHELL, WILLIAMS, SELIG,** |
| **PERKINS COIE LLP** | **GATES & WOODYARD, P.L.L.C.** |
| 1888 Century Park East | 5414 Pinnacle Point Dr., Suite 500 |
| Suite 1700 | Rogers, AR 72758-8131 |
| Los Angeles, CA 90067 | Tel:      (479) 464-5653 |
| Tel:      310.788.9900 | Fax:     (479) 464-5683 |
| Fax:     310.788.3399 | E-Mail:  mney@mwlaw.com |
| E-mail:  gkinsel@perkinscoie.com | |

**ATTORNEYS FOR NINTENDO OF AMERICA INC. AND NINTENDO CO., LTD**

# Hollywood (graphics chip)

From Wikipedia, the free encyclopedia

**Hollywood** is the name of the Graphics Processing Unit (GPU) used in Nintendo's Wii video game console. It was designed by AMD's ATi Technologies division and is manufactured using the same 90 nm CMOS process[1] as the "Broadway" processor. Very few official details have been released to the public by Nintendo, ATI, or IBM. The Hollywood GPU is reportedly based on the Nintendo GameCube's "Flipper" GPU and is clocked 50% higher at 243 MHz[2], though none of the clock rates have been confirmed by Nintendo, IBM, or ATI.



ATI "Hollywood" GPU within the Wii console

The Hollywood is a multi-chip module (MCM) package containing two dies under the cover. One of the two chips, codenamed *Napa*, controls the I/O functions, RAM access, and the actual GPU with its embedded DRAM, and measures 8 × 9 mm. The other, codenamed *Vegas*, holds the Audio DSP and the 24 MB of "internal" 1T-SRAM and measures 13.5 × 7 mm.

The Hollywood also contains an ARM926 core, which has been unofficially nicknamed the *Starlet*[3]. This embedded microprocessor performs many of the I/O functions, including controlling the wireless functionality, USB, the disc drive, and other miscellaneous functions. It also acts as the security controller of the system, performing encryption and authentication functions. The Hollywood includes hardware implementations of AES and SHA-1, to speed up these functions. Communication with the main CPU is accomplished via an IPC mechanism. The Starlet performs the WiiConnect24 functions while the Wii console is in standby mode[3].

## References

1. ^ **(Japanese)** "Wiiの概要 (Wii本体)" (http://www.nintendo.co.jp/n10/e3_2006/wii/index.html) . Nintendo. http://www.nintendo.co.jp/n10/e3_2006/wii/index.html. Retrieved 2007-01-03.
2. ^ "IGN: Revolution's Horsepower" (http://wii.ign.com/articles/699/699118p1.html) . IGN. 2006-03-29. http://wii.ign.com/articles/699/699118p1.html. Retrieved 2006-12-23.
3. ^ *a b* "Starlet" (http://wiibrew.org/wiki/Starlet) . *Wiibrew*. http://wiibrew.org/wiki/Starlet. Retrieved 2008-02-20.

Retrieved from "http://en.wikipedia.org/wiki/Hollywood_(graphics_chip)"
Categories: Nintendo hardware | ATI Technologies products | Graphics hardware | Video game hardware stubs

- This page was last modified on 13 April 2010 at 22:22.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.



FLOYD FB BUSS

ABOUT US
MEET THE TEAM
REPRESENTATIVE MATTERS
CONTACT US

BRIAN BUSS
KENT COOPER
CHAD
ADAM
JOSEPH
REESE
KENNE
NICK S
MATT V

has a technical background and is registered to practice

**KENT COOPER** [X]

**BIOGRAPHY**

Kent's principal area of practice is intellectual property, with a special focus on patent licensing. Kent has experience in patent litigation, as well as in trade secrets. Prior to joining Floyd & Buss LLP, Kent was the Director of Patents & Licensing at Advanced Micro Devices (AMD) where he was involved in defending AMD against numerous allegations of patent infringement and monetizing AMD's patent portfolio for the first time by asserting the portfolio against competitors.

**REPRESENTATIVE EXPERIENCE**

• While working for Motorola, in its Semiconductor Products Sector, Kent was involved in patent licensing negotiations with Mitsubishi, Matsushita, Oki Semiconductor, Rohm, Taiwan Semiconductor Manufacturing Company, Sony, Sharp, Advanced Micro Devices, Kawasaki Steel, Winbond. Macronix. Seiko Epson. Analog Devices. and ST Microelectronics.

5113 Southwest Parkway, Suite 140, Austin, Texas 78735  |  © 2009 Floyd & Buss LLP

App. page 5

COPY

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1   John P. Bovich (SBN 150688)
    E-mail: JBovich@reedsmith.com
2   **Reed Smith LLP**
    Two Embarcadero Center, Suite 2000
3   San Francisco, CA 94111
    Telephone:    415-543-8700
4   Facsimile:    415-391-8269

5   William H. Manning **Lead Counsel** (*pro hac vice application pending*)
    E-mail:  WHManning@rkmc.com
6   Telephone:     612-349-8461
    Brad P. Engdahl (*pro hac vice application pending*)
7   E-mail: BPEngdahl@rkmc.com
    Richard M. Martinez (*pro hac vice application pending*)
8   E-mail: RMMartinez@rkmc.com
    David P. Swenson (*pro hac vice application pending*)
9   E-mail: DPSwenson@rkmc.com
    **Robins, Kaplan, Miller & Ciresi L.L.P.**
10  2800 LaSalle Plaza
    800 LaSalle Avenue
11  Minneapolis, MN 55402
    Telephone:     612-349-8500
12  Facsimile:     612-339-4181

13  David E. Marder (*pro hac vice application pending*)
    E-mail: DEMarder@rkmc.com
14  **Robins, Kaplan, Miller & Ciresi L.L.P.**
    800 Boylston Street, 25th Floor
15  Boston, MA 02199
    Telephone:     617-267-2300
16  Facsimile:     617-267-8288
    Attorneys for Plaintiffs: Advanced Micro Devices, Inc. and ATI Technologies, ULC

17

18                  UNITED STATES DISTRICT COURT

19                NORTHERN DISTRICT OF CALIFORNIA

20

21  (1) ADVANCED MICRO DEVICES,             CV  08         0986
        INC., a Delaware corporation,
22  (2) ATI TECHNOLOGIES, ULC,              **COMPLAINT FOR PATENT
        a Canadian unlimited liability       INFRINGEMENT**
23      company
                                            **[JURY TRIAL DEMANDED]**
24                  Plaintiffs,

25  v.

26  (1) SAMSUNG ELECTRONICS CO.,
        LTD., a Korean business entity,
27  (2) SAMSUNG SEMICONDUCTOR,
        INC., a California corporation,
28  (3) SAMSUNG AUSTIN

1   SEMICONDUCTOR, LLC, a Delaware
    limited liability company,
2   (4)  SAMSUNG ELECTRONICS
         AMERICA, INC., a New York
3        corporation,
    (5)  SAMSUNG
4        TELECOMMUNICATIONS
         AMERICA, LLC, a Delaware limited
5        liability company

6              Defendants.

7

8          Plaintiffs Advanced Micro Devices, Inc. and ATI Technologies, ULC (collectively,

9   "Plaintiffs" or "AMD") allege as follows:

10                            **INTRODUCTION**

11         This is an action against Samsung Electronics Co., Ltd., and its U.S. subsidiaries and

12  related entities Samsung Semiconductor, Inc., Samsung Austin Semiconductor, LLC, Samsung

13  Electronics America, Inc. and Samsung Telecommunications America, LLC (collectively

14  "Defendants" or "Samsung"), for patent infringement under the Patent Laws of the United States,

15  35 U.S.C. § 1 et seq., for infringing U.S. Patent No. 5,545,592, entitled *"Nitrogen Treatment for*

16  *Metal-Silicide Contact"*; U.S. Patent No. 4,737,830, entitled *"Integrated Circuit Structure Having*

17  *Compensating Means for Self-Inductance Effects"*; U.S. Patent No. 5,248,893, entitled *"Insulated*

18  *Gate Field Effect Device with a Smoothly Curved Depletion Boundary in the Vicinity of the*

19  *Channel-Free Zone"*; U.S. Patent No. 5,559,990, entitled *"Memories with Burst Mode Access"*;

20  and U.S. Patent No. 5,377,200, entitled *"Power Saving Feature for Components Having Built-In*

21  *Testing Logic,"* all owned by Advanced Micro Devices, Inc.; and U.S. Patent No. 6,784,879,

22  entitled *"Method and Apparatus for Providing Control of Background Video,"* owned by

23  Advanced Micro Devices, Inc.'s subsidiary, ATI Technologies, ULC.  Collectively, the patents

24  generally cover methods of semiconductor chip fabrication; semiconductors of certain

25  composition, logic, or design; and consumer products incorporating or embodying the disclosed

26  inventions.

27

28

                                    - 2 -                           **COMPLAINT**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

**THE PARTIES**

1.      Advanced Micro Devices, Inc. is a Delaware corporation with its principal offices at One AMD Place, Sunnyvale, California 94085.

2.      ATI Technologies, ULC is a subsidiary of AMD and is incorporated in Alberta, Canada with its principal offices at 1 Commerce Valley Drive E, Markham, Ontario, L3T 7X6, Canada.

3.      Samsung Electronics Co., Ltd. ("SEC") is a Korean business entity with its principal offices at 250, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-742, South Korea.  On information and belief, SEC is South Korea's largest company and one of Asia's largest electronics companies.  SEC designs, manufactures, and provides to the U.S. and world markets flash, DRAM, graphics memory, and other memory components, as well as other logic components, which are used in computers, and myriad mobile and entertainment products.

4.      Samsung Semiconductor, Inc. ("SSI") is a California corporation with its principal place of business located at 3655 North First Street, San Jose, California 95134.  On information and belief, SSI is a wholly owned subsidiary of SEC and was established in 1983 as a California corporation with approximately 300 employees in the Americas.  On information and belief, SSI is the sales arm for SEC and sells flash, DRAM, graphics memory, and other memory components; conducts primary market and product research for SEC; and enables regional customers to influence the direction of SEC's future technologies and products.

5.      Samsung Austin Semiconductor, LLC ("SAS") is a Delaware limited liability company with its principal place of business at 12100 Samsung Boulevard, Austin, Texas 78754.  On information and belief, SAS is one of Samsung's semiconductor fabrication facilities located around the world.

6.      Samsung Electronics America, Inc. ("SEA") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey 07660.  On information and belief, SEA was formed in 1977 as a subsidiary of SEC, and markets, sells, or offers for sale a variety of consumer electronics, including TVs, VCRs, DVD and MP3 players, video cameras, vacuum cleaners, and air conditioners, as well as memory chips and computer

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT
App. page 8

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1  accessories, such as printers, monitors, hard disk drives, and DVD/CD-ROM drives.  On

2  information and belief, SEA also manages the North American operations of Samsung

3  Telecommunications America, Samsung Electronics Canada, and Samsung Electronics Mexico.

4      7.      Samsung Telecommunications America, LLC ("STA") is a Delaware limited

5  liability company with its principal place of business at 1301 East Lookout Drive, Richardson,

6  Texas 75081.  On information and belief, STA was founded in 1996 as a subsidiary of SEC, and

7  markets, sells, or offers for sale a variety of personal and business communications devices in the

8  United States, including cell phones.

9                              **JURISDICTION**

10     8.      This is an action for patent infringement, over which this Court has subject matter

11  jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

12     9.      This Court has personal jurisdiction over each of the Defendants consistent with

13  the requirements of California Code of Civil Procedure § 410.10 and the Due Process Clause of the

14  United States Constitution.  Each Defendant transacts substantial business in California (and in this

15  district), or has committed and continues to commit acts of patent infringement in California (and

16  in this district) as alleged in this complaint.  In addition, SSI in particular maintains a regular and

17  established place of business at 3655 North 1st Street, San Jose, California, 95134.

18                                  **VENUE**

19     10.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and

20  1400(b) because Defendants reside in this judicial district.  Further, SSI has committed acts of

21  infringement and has a regular established place of business in this district.

22                      **INTRADISTRICT ASSIGNMENT**

23     11.     This is a patent infringement action, and therefore exempt from Intradistrict

24  Assignment under Civil L.R. 3-2(c).

25                          **FACTUAL BACKGROUND**

26     12.     Plaintiffs solely own all rights, titles, and interests in and to the following United

27  States patents (collectively, the "AMD Patents"), including the exclusive rights to bring suit with

28  respect to any past, present, and future infringement thereof:

- 4 -

COMPLAINT

(a)   U.S. Patent No. 5,545,592, entitled "*Nitrogen Treatment for Metal-Silicide Contact*," which was duly and legally issued on August 13, 1996, from a patent application filed February 24, 1995, with John Iacoponi as the named inventor. Among other things, the Iacoponi '592 patent discloses an improved method of forming a contact point in a semiconductor device.

(b)   U.S. Patent No. 4,737,830, entitled "*Integrated Circuit Structure Having Compensating Means for Self-Inductance Effects*," which was duly and legally issued on April 12, 1988, from a patent application filed January 8, 1986, with Bharat Patel as the lead named inventor. Among other things, the Patel '830 patent discloses an improved integrated circuit wherein self-inductive voltage spikes are reduced through the use of capacitance means constructed beneath at least one bus.

(c)   U.S. Patent No. 5,248,893, entitled "*Insulated Gate Field Effect Device with a Smoothly Curved Depletion Boundary in the Vicinity of the Channel-Free Zone*," which was duly and legally issued on September 28, 1993, from a patent application filed January 5, 1993, with Shinichi Sakamoto as the named inventor. Among other things, the Sakamoto '893 patent discloses an insulated gate field effect device with a smoothly curved depletion boundary in the vicinity of the channel-free zone.

(d)   U.S. Patent No. 5,559,990, entitled "*Memories with Burst Mode Access*," which was duly and legally issued on September 24, 1996, from a patent application filed October 24, 1994, with Pearl Cheng as the lead named inventor. Among other things, the Cheng '990 patent discloses a memory employing multiple sub-arrays that facilitates faster burst-mode access.

(e)   U.S. Patent No. 5,377,200, entitled "*Power Saving Feature for Components Having Built-In Testing Logic*," which was duly and legally issued on December 27, 1994, from a patent application filed August 27, 1992, with Michael Pedneau as the named inventor. Among other things, the Pedneau '200 patent discloses an

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

- 5 -

1 improvement to built-in testing in an electronic component, in particular the ability

2 to reduce or remove the power applied to testing circuits when not in use.

3 (f) U.S. Patent No. 6,784,879, entitled "*Method and Apparatus for Providing Control*

4 *of Background Video*," which was duly and legally issued on August 31, 2004,

5 from a patent application filed July 14, 1997, with Stephen Orr as the named

6 inventor. Among other things, the Orr '879 patent discloses a method and

7 apparatus for control of background video on a display, which allows the user to

8 control attributes of the video, such as volume, for example, while the video

9 continues to play in the background and another application remains in focus on

10 the display.

11 13. Each of the AMD Patents is valid and enforceable.

12 14. The Defendants have actual notice of all of the AMD Patents and the infringement

13 alleged herein at least upon filing of this complaint (if not earlier), pursuant to 35 U.S.C. § 287(a).

14 On information and belief, Defendants had prior actual notice of at least the Iacoponi '592 patent

15 no later than April 2006 and the Patel '830 patent no later than March 31, 2003.

16 15. Each of the Defendants has directly and indirectly infringed, and continues to

17 infringe, literally or under the doctrine of equivalents, one or more claims of the AMD Patents by

18 acting without authority so as to:

19 (a) make, have made, use, offer to sell, sell within the United States, or import into the

20 United States semiconductor products, including at least Samsung DRAM, SRAM,

21 and NAND-flash memory chips and/or other chips, that embody or practice the

22 patented inventions, as well as electronics products that contain these chips, or

23 practice the patented processes in the United States in connection with these

24 activities;

25 (b) import into the United States or offer to sell, sell, or use within the United States

26 semiconductor products, including at least Samsung DRAM, SRAM, and NAND-

27 flash memory chips and/or other chips made by a process patented by AMD, as

28 well as electronics products that contain these chips; and/or

- 6 -

COMPLAINT
App. page 11

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

(c)    contribute to or actively induce infringement of the AMD Patents.

16.    The above-described acts of infringement committed by Defendants have caused injury and damage to AMD, and as to unexpired patents, will cause additional severe and irreparable injury and damages in the future unless the Defendants are enjoined from further infringing the AMD Patents.

## FIRST CLAIM FOR RELIEF

### Infringement of U.S. Patent No. 5,545,592

17.    AMD incorporates by reference the allegations set forth in paragraphs 1 through 16 above as if specifically set forth herein.

18.    Defendants have directly, indirectly, contributorily, and/or by inducement infringed one or more claims of the Iacoponi '592 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include, but are not limited to, for example, Samsung's DRAM and NAND-flash memory chips, as well as any and all products that incorporate such memory chips or any other memory chips practicing or embodying the claimed invention or manufactured by the patented process. The infringement remains ongoing.

19.    As a consequence of Defendants' infringement, AMD is entitled to recover damages adequate to compensate it for the injuries complained of herein, but in no event less than a reasonable royalty. AMD further is entitled to have Defendants enjoined from committing additional future acts of infringement which would subject AMD to irreparable harm.

20.    On information and belief, Defendants had actual knowledge of the Iacoponi '592 patent since at least as early as April 2006, when during licensing negotiations AMD presented Defendants with a detailed PowerPoint presentation outlining how Defendants' products specifically infringed claims of the Iacoponi '592 patent. Despite Plaintiffs' demand that Defendants either license the Iacoponi '592 patent or cease their infringement, Defendants instead opted to continue their willful, deliberate, and intentional infringement of one or more claims of said patent.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

- 7 -

## SECOND CLAIM FOR RELIEF

### Infringement of U.S. Patent No. 4,737,830

21.     AMD incorporates by reference the allegations set forth in paragraphs 1 through 20 above as if specifically set forth herein.

22.     Defendants have directly, indirectly, contributorily, and/or by inducement infringed one or more claims of the Patel '830 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include but are not limited to, for example, Samsung's DRAM and SRAM memory chips, as well as any and all products that incorporate such memory chips or any other memory chips practicing or embodying the claimed invention.

23.     As a consequence of Defendants' infringement, AMD is entitled to recover damages adequate to compensate it for the injuries complained of herein, but in no event less than a reasonable royalty.

24.     On information and belief, Defendants had actual knowledge of the Patel '830 patent since at least as early as March 31, 2003, when during licensing negotiations AMD presented Defendants with a detailed PowerPoint presentation outlining how Defendants' products specifically infringed claims of the Patel '830 patent.  Despite Plaintiffs' demand that Defendants either license the Patel '830 patent or cease their infringement, Defendants instead opted to continue their willful, deliberate, and intentional infringement of one or more claims of said patent.

## THIRD CLAIM FOR RELIEF

### Infringement of U.S. Patent No. 5,248,893

25.     AMD incorporates by reference the allegations set forth in paragraphs 1 through 24 above as if specifically set forth herein.

26.     Defendants have directly, indirectly, contributorily, and/or by inducement infringed one or more claims of the Sakamoto '893 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.  The infringing products include but are not limited to, for example, Samsung's DRAM memory chips, as well as any and all products that incorporate such memory chips or any other memory chips practicing or embodying the claimed invention.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT
App. page 13

27. As a consequence of Defendants' infringement, AMD is entitled to recover damages adequate to compensate it for the injuries complained of herein, but in no event less than a reasonable royalty. AMD further is entitled to have Defendants enjoined from committing additional future acts of infringement which would subject AMD to irreparable harm.

## FOURTH CLAIM FOR RELIEF

### Infringement of U.S. Patent No. 5,559,990

28. AMD incorporates by reference the allegations set forth in paragraphs 1 through 27 above as if specifically set forth herein.

29. Defendants have directly, indirectly, contributorily, and/or by inducement infringed one or more claims of the Cheng '990 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include but are not limited to, for example, Samsung's memory chips such as the K4T51083QC 512MB 90nm Rev "C" DDR2 SDRAM, as well as cell phones, MP3 players, televisions, printers, and any and all other products that incorporate this or any other chip embodying the claimed invention. Defendants' infringement remains ongoing.

30. As a consequence of Defendants' infringement, AMD is entitled to recover damages adequate to compensate it for the injuries complained of herein, but in no event less than a reasonable royalty. AMD further is entitled to have Defendants enjoined from committing additional future acts of infringement which would subject AMD to irreparable harm.

## FIFTH CLAIM FOR RELIEF

### Infringement of U.S. Patent No. 5,377,200

31. AMD incorporates by reference the allegations set forth in paragraphs 1 through 30 above as if specifically set forth herein.

32. Defendants have directly, indirectly, contributorily, and/or by inducement infringed one or more claims of the Pedneau '200 patent, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271. The infringing products include but are not limited to, for example, the S3C2412 Application Processor, as well as cell phones, MP3 players, televisions,

COMPLAINT
App. page 14

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1  printers, and any and all other products that incorporate the S3C2412 processor or any other

2  processor embodying the claimed invention. Such infringement remains ongoing.

3    33.    As a consequence of Defendants' infringement, AMD is entitled to recover

4  damages adequate to compensate it for the injuries complained of herein, but in no event less than

5  a reasonable royalty. AMD further is entitled to have Defendants enjoined from committing

6  additional future acts of infringement which would subject AMD to irreparable harm.

7  ## SIXTH CLAIM FOR RELIEF

8  ## Infringement of U.S. Patent No. 6,784,879

9    34.    AMD incorporates by reference the allegations set forth in paragraphs 1 through

10  33 above as if specifically set forth herein.

11    35.    Defendants have directly, indirectly, contributorily, and/or by inducement

12  infringed one or more claims of the Orr '879 patent, literally and/or under the doctrine of

13  equivalents, in violation of 35 U.S.C. § 271. The infringing products include but are not limited to,

14  for example, Samsung's LN-T1953H television, as well as all other Samsung televisions or other

15  display devices that incorporate or embody the claimed invention. Such infringement remains

16  ongoing.

17    36.    As a consequence of Defendants' infringement, AMD is entitled to recover

18  damages adequate to compensate it for the injuries complained of herein, but in no event less than

19  a reasonable royalty. AMD further is entitled to have Defendants enjoined from committing

20  additional future acts of infringement which would subject AMD to irreparable harm.

21  ## PRAYER FOR RELIEF

22    **WHEREFORE,** AMD respectfully requests that this Court:

23    A.    enter judgment that each of the Defendants has infringed one or more claims of the

24  AMD Patents;

25    B.    enter judgment that Defendants' infringement of the Iacoponi '592 patent and

26  Patel '830 patent has been willful, deliberate, and intentional;

27    C.    enter a preliminary and permanent injunction, pursuant to 35 U.S.C. § 283,

28  enjoining each of the Defendants, and all of their respective agents, servants, officers, directors,

- 10 -

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

COMPLAINT

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
MINNEAPOLIS

1   employees, and all other persons acting in concert with them, directly or indirectly, from any

2   further acts of infringement, contributory infringement, or inducement of infringement of the non-

3   expired AMD Patents;

4        D.    enter an order, pursuant to 35 U.S.C. § 284, awarding to AMD damages adequate

5   to compensate for Defendants' infringement of the AMD Patents (and, if necessary, related

6   accountings), in an amount to be determined at trial, but not less than a reasonable royalty;

7        E.    enter an order, pursuant to 35 U.S.C. § 284, trebling damages awarded to AMD to

8   the extent Defendants' infringement is determined to have been willful;

9        F.    enter an order, pursuant to 35 U.S.C. § 285, deeming this to be an "exceptional

10  case" and thereby awarding to AMD its reasonable attorneys' fees, costs, and expenses;

11       G.    enter an order that Defendants account for and pay to AMD the damages to which

12  AMD is entitled as a consequence of the infringement;

13       H.    enter an order awarding to AMD pre- and post-judgment interest at the maximum

14  rates allowable under the law; and,

15       I.    enter an order awarding to AMD such other and further relief, whether at law or in

16  equity, that this Court deems just and proper.

17                          Respectfully submitted,

18  DATED: February 18 2008

19

20                         **REED SMITH LLP**

21

22                         By: _____

23                             John P. Bovich

24                 **ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

25                 William H. Manning **Lead Counsel**
                   Brad P. Engdahl

26                 David E. Marder
                   Richard M. Martinez

27                 David P. Swenson

28                 Attorneys for Plaintiffs Advanced Micro
                   Devices, Inc. and ATI Technologies, ULC

COMPLAINT

1     **DEMAND FOR JURY TRIAL**

2          AMD demands a jury trial on all issues so triable.

3

4     DATED: February 18, 2008

5

6                                    **REED SMITH LLP**

7

8                                    By: _____
                                          John P. Bovich
9

10                                   **ROBINS, KAPLAN, MILLER & CIRESI L.L.P**

11                                        William H. Manning **Lead Counsel**
                                          Brad P. Engdahl
12                                        David E. Marder
                                          Richard M. Martinez
13                                        David P. Swenson

14                                   Attorneys for Plaintiffs Advanced Micro Devices, Inc.
                                     and ATI Technologies, ULC
15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 12 -

**COMPLAINT**
App. page 17

VINSON & ELKINS L.L.P.
WILLEM G. SCHUURMAN (admitted *pro hac vice*)
DAVID E. KILLOUGH (State Bar No. 110719)
DAVID P. BLANKE (admitted *pro hac vice*)
ADAM V. FLOYD (admitted *pro hac vice*)
CHRISTOPHER V. RYAN (admitted *pro hac vice*)
GENTRY C. MCLEAN (admitted *pro hac vice*)
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, TX 78746
Tel: (512) 542-8428
Fax: (512) 236-3253

Attorneys for Advanced Micro Devices, Inc.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| OKI AMERICA, INC., ET AL.,<br><br>PLAINTIFF,<br><br>VS.<br><br>ADVANCED MICRO DEVICES, INC.,<br><br>DEFENDANT. | C04-03171-CRB<br><br>DECLARATION OF ADAM FLOYD IN SUPPORT OF AMD'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT |
| ADVANCED MICRO DEVICES, INC.,<br><br>COUNTERCLAIMANT,<br><br>VS.<br><br>OKI AMERICA, INC., OKI ELECTRIC INDUSTRY CO., LTD., OKI DATA CORPORATION AND OKI DATA AMERICAS, INC.,<br><br>COUNTER-DEFENDANTS. | |

I, Adam V. Floyd, declare and state as follows:

      1.     I am a partner in the firm of Vinson & Elkins L.L.P. ("V&E"), and counsel of

record for Advanced Micro Devices (AMD) in the above captioned case. I have personal

C04-03171-CRB

DECLARATION OF ADAM FLOYD IN SUPPORT OF AMD'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

App. page 18

1  knowledge of the facts and matters stated in this declaration and, if called as a witness,

2  would testify to the facts set forth herein.

3      2.      Attached hereto as Exhibit Q is the deposition of Anthony J. Denboer, dated

4  August 3, 2006.

5

6      3.      Attached hereto as Exhibit R is the Declaration of Tony Denboer, dated July

7  24, 2006.

8      4.      Attached hereto as Exhibit V is a copy of U.S. Patent 4,775,809 to Watanabe.

9
   5.      Attached hereto as Exhibit W is U.S. Patent 5,021,853 to Mistry.
10

11     6.      Attached hereto as Exhibit X is a copy of Neikirk Declaration dated

12 8/25/2006.

13     7..     Attached hereto as Exhibit Ex. Z-1 is a copy of '571 Prosecution, ROA dated

14 12/16/1996 at 14.

15

16     8.      Attached hereto as Exhibit Ex. Z-2 is a copy of "Soft Breakdown Leakage of

17 off-State nMOSFETs Induced by HBM ESD Events Using Drain Engineering for LDD

18 Structure," IEICE Trans. Fund. vol. E77-A. No. 1, Jan. 1994 166-172, 171.

19
       9.      Attached hereto as Exhibit Ex. Z-3 is a copy of Fair Dec. dated 8/16/2006 at
20
   7, ¶19.
21

22     10.     Attached hereto as Exhibit Ex. Z-4 is a copy of Fair Report dated 7/21/2006

23 at 42, ¶¶116-119.

24 I declare under penalty of perjury that the foregoing is true and correct.

25
   Executed August 25, 2006.
26

27                                          /s/
                                          Adam V. Floyd
28                                  -2-
                               C04-03171-CRB
   DECLARATION OF ADAM FLOYD IN SUPPORT OF AMD'S SUPPLEMENTAL BRIEF IN FURTHER SUPPORT OF ITS MOTION FOR PARTIAL
                               SUMMARY JUDGMENT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| OKI AMERICA, INC., ET AL., | C04-03171-CRB |
| PLAINTIFF, | (~~Proposed~~) |
| VS. | ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY H. KENNETH PROL *PRO HAC VICE* |
| ADVANCED MICRO DEVICES, INC., | |
| DEFENDANT. | |
| ADVANCED MICRO DEVICES, INC., | |
| COUNTERCLAIMANT, | |
| VS. | |
| OKI AMERICA, INC., OKI ELECTRIC INDUSTRY CO., LTD., OKI DATA CORPORATION AND OKI DATA AMERICAS, INC., | **File By Fax** |
| COUNTER-DEFENDANTS. | |

H. Kenneth Prol, an active member in good standing of the bar of the State of Texas, whose business address and telephone number is Vinson & Elkins, L.L.P., The Terrace 7, 2801 Via Fortuna, Suite 100, Austin, Texas 78746, (512) 542-8400, having applied in the above-entitled action for admission to practice in the Northern District of California on a *pro hac vice* basis representing Advanced Micro Devices, Inc.,

IT IS HEREBY ORDERED THAT the application is granted, subject to the terms and conditions of Civil L.R. 11-3. All papers filed by the attorney must indicate appearance *pro hac vice*. Service of papers upon and communications with co-counsel designated in the application will constitute notice to the party. All future filings in this

1    action are subject to the requirements contained in General Order No. 45, *Electronic Case*

2    *Filing.*

3    Dated:    Aug. 15, 2005

4                                                                    _____
                                                                    Charles R. Breyer

5                                                                    United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| MICROLINC, LLC,<br>a Delaware Limited Liability Company,<br><br>     Plaintiff/Counterdefendant,<br><br>v.<br><br>INTEL CORP.,<br>ACER INC.,<br>ACER AMERICA CORP.,<br>ADVANCED MICRO DEVICES INC.,<br>APPLE INC.,<br>DELL INC.,<br>GATEWAY INC.,<br>HEWLETT-PACKARD CO.,<br>LENOVO GROUP LTD.,<br>LENOVO (UNITED STATES), INC.,<br>NVIDIA CORP.,<br>SONY CORP.,<br>SONY COMPUTER ENTERTAINMENT,<br>SONY CORP. OF AMERICA,<br>SONY ELECTRONICS INC.,<br>SONY COMPUTER ENTERTAINMENT<br>AMERICA INC.,<br>TOSHIBA CORP.,<br>TOSHIBA AMERICA INC., AND<br>TOSHIBA AMERICA INFORMATION<br>SYSTEMS INC.<br><br>     Defendants/Counterclaimants. | Civil Action No. 2:07-CV-488-TJW |

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that the following individual hereby enters his appearance as counsel of record on behalf of Defendant Advanced Micro Devices, Inc.

App. page 22

Adam V. Floyd (State Bar No. 00790699)
VINSON & ELKINS, L.L.P
2801 Via Fortuna, Suite 100
Austin, Texas 78746
Tel: (512) 542-8648
Fax: (512) 236-3466
afloyd@velaw.com

Dated: March 7, 2008                    Respectfully submitted,

                                        /s/ *Adam V. Floyd*
                                        Adam V. Floyd (SBOT 00790699)
                                        Michael J. Smith (SBOT 24037517)
                                        H. Kenneth Prol (SBOT 24027757)
                                        Chad Ennis (SBOT 24045834)
                                        Nicholas A. Schuneman (SBOT 24056283)
                                        VINSON & ELKINS L.L.P.
                                        The Terrace 7
                                        2801 Via Fortuna, Suite 100
                                        Austin, Texas 78746
                                        Tel:    512.542.8400
                                        Fax:    512.542-8612
                                        afloyd@velaw.com
                                        mjsmith@velaw.com
                                        kprol@velaw.com
                                        cennis@velaw.com
                                        nschuneman@velaw.com

                                        *ATTORNEYS FOR ADVANCED MICRO
                                        DEVICES, INC.*

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| MICROLINC, LLC,<br>a Delaware Limited Liability Company,<br><br>      Plaintiff/Counterdefendant,<br><br>v.<br><br>INTEL CORP.,<br>ACER INC.,<br>ACER AMERICA CORP.,<br>ADVANCED MICRO DEVICES INC.,<br>APPLE INC.,<br>DELL INC.,<br>GATEWAY INC.,<br>HEWLETT-PACKARD CO.,<br>LENOVO GROUP LTD.,<br>LENOVO (UNITED STATES), INC.,<br>NVIDIA CORP.,<br>SONY CORP.,<br>SONY COMPUTER ENTERTAINMENT,<br>SONY CORP. OF AMERICA,<br>SONY ELECTRONICS INC.,<br>SONY COMPUTER ENTERTAINMENT<br>AMERICA INC.,<br>TOSHIBA CORP.,<br>TOSHIBA AMERICA INC., AND<br>TOSHIBA AMERICA INFORMATION<br>SYSTEMS INC.<br><br>      Defendants/Counterclaimants. | Civil Action No. 2:07-CV-488-TJW |

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that the following individual hereby enters his appearance as counsel of record on behalf of Defendant Advanced Micro Devices, Inc.

H. Kenneth Prol (State Bar No. 24027757)
VINSON & ELKINS, L.L.P
2801 Via Fortuna, Suite 100
Austin, Texas  78746
Tel:  (512) 542-8714
Fax:  (512) 236-3289
kprol@velaw.com

Dated:  March 7, 2008

Respectfully submitted,

/s/ *H. Kenneth Prol*
Adam V. Floyd (SBOT 00790699)
Michael J. Smith (SBOT 24037517)
H. Kenneth Prol (SBOT 24027757)
Chad Ennis (SBOT 24045834)
Nicholas A. Schuneman (SBOT 24056283)
VINSON & ELKINS L.L.P.
The Terrace 7
2801 Via Fortuna, Suite 100
Austin, Texas  78746
Tel:    512.542.8400
Fax:    512.542-8612
afloyd@velaw.com
mjsmith@velaw.com
kprol@velaw.com
cennis@velaw.com
nschuneman@velaw.com

*ATTORNEYS FOR ADVANCED MICRO
DEVICES, INC.*

-2-

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
Fayetteville Division

SHARED MEMORY GRAPHICS LLC,

      Plaintiff,

v.

APPLE INC., et al.

      Defendants,

Civil Action No.: 5:09-cv-5128 (RTD)

## SMG'S NOTICE OF RULE 30(b)(6) DEPOSITION TO NINTENDO OF AMERICA INC.

PLEASE TAKE NOTICE that pursuant to Fed. R. Civ. P. 30(b)(6), Plaintiff SHARED MEMORY GRAPHICS LLC ("SMG") will take the deposition upon oral examination of Defendant Nintendo of America Inc. at the offices of MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, PLLC, 5414 Pinnacle Point Drive, Suite 500, Rogers, AR 72758, or at such other place as the parties may agree, commencing at 9:00 a.m. on January 27, 2010, and continuing from day to day thereafter until completed. The deposition will be recorded stenographically and by video.

As required by Rule 30(b)(6), Nintendo of America Inc. shall designate one or more officers, directors, managing agents, or other persons to testify on its behalf about the matters set forth in Exhibit "A" attached hereto.

Dated:  January 11, 2010

Respectfully submitted,

/s/  *H. Kenneth Prol*

Nicholas H. Patton
AR Bar No. 63035
**PATTON, TIDWELL & SCHROEDER, L.L.P.**
4605 Texas Boulevard
P.O. Box 5398
Texarkana, Texas 75505-5398
Telephone:  903/792-7080
Facsimile  :  903/792-8233

J. Gregory Magness
AR Bar No. 92075
**HARDIN, JESSON & TERRY, PLC**
Attorneys at Law
P.O. Box 10127
Fort Smith, Arkansas 72917-0127
Telephone:  479/452-2200
Facsimile:  479/452-9097

**OF COUNSEL**:

Adam V. Floyd
Brian K. Buss
Kent J. Cooper
H. Kenneth Prol
Joseph D. Gray
**FLOYD & BUSS, L.L.P.**
5113 Southwest Parkway, Suite 140
Austin, TX 78735
Telephone:  (512) 681-1500
Facsimile  :  (512) 681-1590

**ATTORNEYS FOR PLAINTIFF
SHARED MEMORY GRAPHICS**

6872-1

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2010, the foregoing was served on the following counsel of record by Federal Express with a courtesy copy via email:

Timothy S. Teter
COOLEY GODWARD KRONISH LLP
Five Palo Alto Square
3000 Camino Real
Palo Alto, CA 94306-2155
teterts@cooley.com; icunningham@cooley.com; bdamstedt@cooley.com; crass@fec.net

ATTORNEYS FOR APPLE

_____

Darin Glasser
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
dglasser@omm.com; mmyers@omm.com; griley@omm.com; ryagura@omm.com;
dyoung@youngpickettlaw.com

ATTORNEYS FOR SAMSUNG

_____

Grant E. Kinsel
PERKINS COIE LLP
1888 Century Park East, Ste. 1700
Los Angeles, CA 90067-1721
gkinsel@perkinscoie.com; mney@mwlaw.com

ATTORNEYS FOR NINTENDO

_____

Richard S. Gresalfi
KENYON & KENYON LLP
One Broadway
New York, NY 10004
rgresalfi@kenyon.com; mcarniaux@kenyon.com; mfaust@kenyon.com; lpopovski@kenyon.com;
quattlebaum@qgtb.com; bcate@qgtb.com; jdempsey@qgtb.com

ATTORNEYS FOR SONY

_____

/s/ *Abbey L. Epley*_____
Paralegal
FLOYD & BUSS LLP

6872-1

App. page 28

**EXHIBIT A:  LIST OF VENUE-RELATED RULE 30(b)(6) DEPOSITION TOPICS**

1. Nintendo of America's history of negotiating sales or distribution contracts with any Wal-Mart Stores, Inc. entity (including Sam's Club) in Arkansas, including but not limited to the following:
   a. Identification of individuals involved in negotiations and their location and responsibilities;
   b. Terms of agreements with any Wal-Mart Stores, Inc. entity and basis and course of negotiations of those terms;
   c. Details about any and all visits to any Wal-Mart Stores, Inc. entity or personnel in Arkansas including identification of the frequency of visits, identification of individuals involved on both sides, identification of any sales agents on behalf of Nintendo of America in Arkansas, and the substance of the meetings conducted with any Wal-Mart Stores entity; and
   d. Identification of revenue derived from sales and total units sold to and through Wal-Mart Stores, Inc. entities as a percentage of the whole.

2. Nintendo of America's history of negotiating sales or distribution contracts with all other major retailers including Best Buy, Circuit City, Target, Costco, Gamestop, Sears, and RadioShack for the Nintendo of America Wii or the Nintendo of America Gamecube, including but not limited to the following:
   a. Identification of individuals involved in negotiations with these retailers and their location and responsibilities;
   b. Terms of agreements with any major retailer entity and basis and course of negotiations of those terms;
   c. Details about any and all visits to any major retailer's premises including identification of the frequency of visits, identification of individuals involved on both sides, identification of any sales agents on behalf of Nintendo of America, and the substance of the meetings conducted with any retailer; and
   d. Identification of revenue derived from sales and total units sold to and through each as a percentage of the whole.

3. Identify all manufacturing details of the Nintendo of America Wii and Gamecube and the integrated circuit chips that comprise the central processing unit, the graphics processor, and any additional RAM memory used in these products, including:
   a. Identification of internal personnel responsible for manufacturing including their locations and responsibilities;
   b. Identification of any third parties responsible for manufacturing including the location of manufacture and any other manufacturing details known to Nintendo of America for each component; and
   c. Details of any manufacturing and/or sales agreements and contracts relating to the above listed components.

-4-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED-CLERK
U.S. DISTRICT COURT

2007 JUN -7 PM 4: 57

TX EASTERN-MARSHALL

| | | |
|---|---|---|
| LONESTAR INVENTIONS, L.P. | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | 6:07-CV-261 |
| NINTENDO OF AMERICA, INC. | § | |
| Defendant. | § | JURY TRIAL DEMANDED *LED* |

## COMPLAINT AND APPLICATION FOR PERMANENT INJUNCTION

Plaintiff Lonestar Inventions, L.P. ("Lonestar") brings this action against Defendant Nintendo of America, Inc. ("Nintendo") and alleges:

### PARTIES

1.    Plaintiff Lonestar is a Texas limited partnership.

2.    Defendant Nintendo is a Washington corporation that has its principal place of business in Redmond, Washington. Nintendo is authorized to do business in Texas. Nintendo may be served by serving its registered agent for service of process, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

### JURISDICTION

4.    This action arises under the patent laws of the United States, Title 35 United States Code. Jurisdiction is proper under 28 U.S.C. § 1331 and § 1338.

5.    Nintendo does business in this State and District and has sufficient contacts to subject it to the personal jurisdiction of this Court for this patent infringement action. Nintendo is selling and offering to sell, and has within a reasonable period prior to the filing of this action, sold and offered to sell its products, including the infringing products, to consumers in this State and in this District, either directly or indirectly. Nintendo has placed its products, including the infringing products, into the stream of commerce, knowing or reasonably expecting that such products will be used, sold, or offered to be sold in this State and in this District.

Nintendo has intentionally established distribution channels to offer its products for sale and to sell its products, including the infringing products, in this State and in this District, and as a result, the infringing product has been and is being sold and used in this State and District.

## VENUE

6.     Venue is proper in this Court under 28 U.S.C. § 1400(b) because Nintendo resides in this District within the meaning of 28 U.S.C. § 1391(c). In addition, venue is proper in this Court under 28 U.S.C. §§ 1391(b)-(c) because (i) Nintendo resides in this District and (ii) a substantial part of the events or omissions giving rise to the claims against Nintendo occurred in this District.

## BACKGROUND

7.     This is an action for infringement of United States Patent No. 5,208,725 ("the '725 Patent"), entitled "High Capacitance Structure in a Semiconductor Device."

7     On May 4, 1993, the '725 Patent was duly and legally issued by the United States Patent and Trademark Office to Osman E. Akcasu, the inventor.   Mr. Akcasu subsequently assigned the '725 Patent, together with all rights to sue for past infringement, to Lonestar. Lonestar is the lawful owner of the '725 Patent. A true and correct copy of the '725 Patent is attached as Exhibit "A."

8.     Nintendo has been for some time past and is presently infringing the '725 Patent within this District and elsewhere in this country by making, selling, offering for sale and using semiconductor devices embodying the patented invention, and will continue to do so unless enjoined by this Court   By its actions, Nintendo has also induced others to infringe the '725 Patent.

9.     On information and belief, Nintendo has been given notice that it is infringing the '725 Patent. Yet Nintendo is continuing to infringe the Patent. Nintendo's infringement of the '725 Patent is willful and deliberate.

2

10.     As a result of Nintendo's infringement of the '725 Patent, Lonestar is suffering an irreparable injury in that it is being deprived of its property rights in unique property. The remedies available at law, such as monetary damages, are not fully adequate to compensate for that injury. Considering the balance of hardships between Lonestar and Nintendo, a remedy in equity is warranted. The public interest would not be disserved by a permanent injunction

## CAUSES OF ACTION

### A.     Patent Infringement Under 35 U.S.C. § 271(a)

11.     Nintendo has, in this country, used, offered for sale and sold the patented invention claimed in the '725 Patent, and has imported in violation of 35 U.S.C. § 271(a).

### B.     Actively Inducing Patent Infringement Under 35 U.S.C. § 271(b)

12.     Nintendo has, in this country, actively induced others to use and/or sell the patented invention claimed in the '725 Patent, in violation of 35 U.S.C. § 271(b).

## RELIEF

13.     Plaintiff respectfully requests the following relief:

a.     that the Court enter a permanent injunction against Nintendo, and all others in active concert with it, prohibiting them from (i) directly infringing the '725 Patent, and/or (ii) inducing infringement of the '725 Patent by others;

b.     that the Court award actual damages to Lonestar against Nintendo;

c.     that the Court treble the damages for willful infringement pursuant to 35 U.S.C. § 284;

d.     that the Court award interest on such damages;

e.     that the Court award Lonestar costs and attorney's fees incurred in this action pursuant to 35 U.S.C. § 285; and

f.     that the Court award such other relief as the Court deems just and proper.

3

## DEMAND FOR A JURY TRIAL

14.     Lonestar hereby demands a trial by jury as to all issues triable by a jury.

Respectfully submitted,

By: _____
Chris Reynolds
T.B.A. No. 16801900
jreynolds@gibbs-bruns.com
Phillip T. Bruns
T.B.A. No. 03258500
pbruns@gibbs-bruns.com
Barrett H. Reasoner
T.B.A. 16641980
breasoner@gibbs-bruns.com
GIBBS & BRUNS, L.L.P.
1100 Louisiana, Suite 5300
Houston, Texas   77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903
**ATTORNEYS FOR LONESTAR
INVENTIONS, L.P.**

OF COUNSEL:
Kurt M. Sauer
ksauer@dmtechlaw.com
State Bar No. 17673700
Stacy L. Zoern
szoern@dmtechlaw.com
State Bar No. 24051565
DAFFER MCDANIEL, LLP
700 Lavaca Street, Suite 720
Tel. (512) 476-1400
Fax (512) 703-1250

Tommy Jacks
T.B.A. No. 10452000
JACKS LAW FIRM
Suite 1010 Franklin Plaza
111 Congress Avenue
Austin, TX  78701
Telephone:  (512) 478-4422
Facsimile:  (512) 478-5015
Email: tjacks@JacksLawFirm.com

4

Carl R. Roth
The Roth Firm
115 N. Wellington, Suite 200
Marshall, Texas 75670-3396
Telephone:  (903) 935-1665
Facsimile:  (909) 935-1797
Email: cr@rothfirm.com

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| LONESTAR INVENTIONS, L.P. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. _____ |
| | § | |
| ADVANCED MICRO DEVICES, INC., | § | |
|     Defendant. | § | JURY TRIAL DEMANDED |

## COMPLAINT AND APPLICATION FOR PERMANENT INJUNCTION

Plaintiff Lonestar Inventions, L.P. ("Lonestar") brings this action against Defendants Advanced Micro Devices, Inc. ("AMD") and alleges:

### PARTIES

1.    Plaintiff Lonestar is a Texas limited partnership.

2.    Defendant AMD is a Delaware corporation that is authorized to do business in Texas, and does business in Texas.  AMD may be served by serving its registered agent for service of process, CT Corporation System, 350 North St. Paul St., Dallas, Texas 75201.

### JURISDICTION

3.    This action arises under the patent laws of the United States, Title 35 United States Code.  Jurisdiction is proper under 28 U.S.C. § 1338.

4.    AMD does business in this State and District and has sufficient contacts to subject it to the personal jurisdiction of this Court for this patent infringement action.

### VENUE

5.    Venue is proper in this Court under 28 U.S.C. § 1400(b) because AMD resides in this District within the meaning of 28 U.S.C. § 1391(c).  In addition, venue is proper in this

194211

Court under 28 U.S.C. §§ 1391(b)-(c) because AMD (i) resides in this District and (ii) a substantial part of the events or omissions giving rise to the claims against AMD occurred in this District.

## BACKGROUND

6.     This is an action for infringement of United States Patent No. 5,208,725 ("the '725 Patent"), entitled "High Capacitance Structure in a Semiconductor Device."

7.     On May 4, 1993, the '725 Patent was duly and legally issued by the United States Patent and Trademark Office to Osman E. Akcasu, the inventor.  Mr. Akcasu subsequently assigned the '725 Patent, together with all rights to sue for past infringement, to Lonestar. Lonestar is the lawful owner of the '725 Patent.  A true and correct copy of the '725 Patent is attached as Exhibit "A."

8.     AMD has been for some time past and is currently infringing the '725 Patent and inducing others to infringe the '725 Patent within this District and elsewhere in this country by making, selling, offering for sale and using semiconductor devices embodying the patented invention, and inducing others to do so, and will continue to do so unless enjoined by this Court. Although Lonestar does not know the full extent of AMD's infringement and inducement, Lonestar is aware that AMD has made, had made, imported into this country, offered to sell, sold, and or induced others to make, have made, import, sell or offer to sell in this country, at least the following products: (1) the Nintendo Wii, containing chip-sets designed by AMD or its predecessors in interest; and (2) graphics cards containing the ATI 215-0669049 graphics processor, including without limitation, the Radeon HD 4870 graphics card.

2

9.     AMD has been given written notice that AMD is infringing the '725 Patent. AMD has failed and refused to cease infringing the Patent. AMD's infringement of the '725 Patent is willful and deliberate.

**CAUSES OF ACTION**

**A.     Patent Infringement Under 35 U.S.C. § 271(a)**

10.     AMD has, in this country, made, used, offered for sale and sold the patented invention claimed in the '725 Patent, in violation of 35 U.S.C. § 271(a).

**B.     Actively Inducing Patent Infringement Under 35 U.S.C. § 271(b)**

11.     AMD has, in this country, actively induced others to make, use, import and/or sell the patented invention claimed in the '725 Patent, in violation of 35 U.S.C. § 271(b).

**RELIEF**

12.     Plaintiff respectfully requests the following relief:

a.     that the Court enter a permanent injunction against AMD and all others in active concert with them, prohibiting them from (i) directly infringing the '725 Patent, and/or (ii) inducing infringement of the '725 Patent by others;

b.     that the Court award damages to Lonestar against AMD;

c.     that the Court treble the damages for willful infringement pursuant to 35 U.S.C. § 284;

d.     that the Court award interest on such damages;

e.     that the Court award Lonestar costs and attorney's fees incurred in this action pursuant to 35 U.S.C. § 285; and

f.     that the Court award such other relief as the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

23.     Lonestar hereby demands a trial by jury as to all issues triable by a jury.

Respectfully submitted,

By:     ___/s/ Chris Reynolds_____
Chris Reynolds
T.B.A. No. 16801900
**GIBBS & BRUNS, L.L.P.**
1100 Louisiana, Suite 5300
Houston, Texas    77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

**ATTORNEY-IN-CHARGE FOR PLAINTIFF
LONESTAR INVENTIONS, L.P.**

OF COUNSEL:
Kurt M. Sauer
State Bar No. 17673700
**DAFFER MCDANIEL, LLP**
700 Lavaca Street, Suite 720
Tel. (512) 476-1400
Fax (512) 703-1250
Email: ksauer@dmtechlaw.com

Phillip T. Bruns
T.B.A. No. 03258500
Barrett Reasoner
T.B.A. No. 16641980
**GIBBS & BRUNS, L.L.P.**
1100 Louisiana, Suite 5300
Houston, Texas    77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

Carl R. Roth
**The Roth Firm**
115 N. Wellington, Suite 200
Marshall, Texas 75670-3396
Telephone:  (903) 935-1665
Facsimile:  (909) 935-1797
Email: cr@rothfirm.com

194211                                    4

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| LONESTAR INVENTIONS, L.P. | § | |
| | § | |
| Plaintiff | § | |
| v. | § | |
| | § | Civil Action No. 6:07-cv-00261-LED |
| NINTENDO OF AMERICA, INC. | § | |
| Defendant | § | |
| | § | |

## ORDER GRANTING AND ENTERING THE RULE 41 STIPULATION OF DISMISSAL WITH PREJUDICE

This matter came before the Court upon the Rule 41 Stipulation of Dismissal with prejudice filed by Plaintiff Lonestar Inventions, L.P. and Defendant, Nintendo of America Inc. Pursuant to Rule 41 of the Federal Rules of Civil Procedure, it is hereby ORDERED that all claims and counterclaims in this action are hereby dismissed, with costs to be borne by the party incurring same. This dismissal is with prejudice, except Nintendo's counterclaim that United States Patent No. 5,208,725 is invalid is dismissed without prejudice.

{A48\7709\0003\W0398921.1 }

**ABA/BNA**
# Lawyers' Manual on Professional Conduct

Source: ABA Ethics Opinions > ABA Formal Ethics Opinions > Formal Opinion 99-415 September 8, 1999

**Formal Opinion 99-415**
**September 8, 1999**

### Representation Adverse to Organization by Former In-house Lawyer

*When an in-house lawyer moves to a law firm or another legal department, both he and his new law firm have ethical obligations that limit their ability to handle matters adverse to his former employer. If the former in-house lawyer personally represented his employer in a matter, neither he nor his new firm may undertake a representation adverse to his former employer in the same or a substantially related matter absent the former employer's consent. Even if the former in-house lawyer did not personally represent his former employer in a matter, but obtained protected information concerning that matter while it was being handled by others in his legal department, he will be disqualified and his disqualification will be imputed to his new firm.*

*Having borne supervisory responsibility for a matter without some personal involvement does not necessarily mean that the former in-house lawyer personally represented his former employer with respect to that matter. Similarly, the fact that he was responsible for matters of a particular type will not by itself preclude him from representing a client in a similar matter in which the former employer is an adverse party.*

In this Opinion, the Committee addresses the extent to which, under the ABA Model Rules of Professional Conduct (1999), a lawyer may represent a client in a matter adverse to an organization that previously employed the lawyer as in-house counsel [1] in the absence of the organization's consent. [2] The increased frequency with which lawyers employed by an organization [3] are hired by a competitor or by a law firm [4] seeking the expertise gained by the lawyer in his former position has resulted in a greater focus on this issue. Current and prospective employers as well as in-house counsel themselves have reason for concern.

---

[1] Although this Opinion is limited to the lawyer's duties under the Model Rules, the lawyer also is subject to common law duties applicable to all fiduciaries that are not dependent upon his status as a lawyer and that may in turn give rise to a conflict of interest for purposes of Rule 1.7(b). *See* Maritrans GP Inc. v. Pepper, Hamilton & Scheetz, 529 Pa. 241, 254, 602 A.2d 1277, 1283 (Pa. 1992), ("By ignoring the common law principles of fiduciary duty, the Superior Court elevated attorneys above the law and granted to them greater rights and protection than are enjoyed by any other fiduciaries in this Commonwealth. No rule so preferring attorneys can be permitted to stand.").

[2] The term "consent" is used in this Opinion to mean "consent after consultation" as used in the Model Rules. "Consultation" is defined in the Terminology section of the Model Rules as "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." The timing and extent of consultation required partly is dependent on the degree of sophistication of the party giving the consent.

[3] An "organization" for purposes of this Opinion includes a corporation, partnership, trust, or other entity. This Opinion does not apply to former government employees. The provisions of Rule 1.11 specifically are applicable when the former employer is a government agency.

[4] "Law firm" includes an organization's legal department. *See* "Terminology" and Comment, Rule 1.10.

---

The organization employing the in-house counsel experiences a tension between its need to have free and open communications among its in-house counsel and other employees and its concern that information gained by the in-house counsel be protected from disclosure and not used to its detriment in the future. The prospective employer has concern about the extent to which the conflict of interest rules will limit a newly hired former in-house counsel in his ability to use the skill and knowledge gained during his previous employment. Finally, the in-house counsel reasonably shares that concern, not least because questions about limits on his ability to use skill and knowledge obtained in an in-house counsel role affect his subsequent employment opportunities.

*Disqualification of the Former In-House Lawyer*

Although certain aspects of in-house lawyers' conduct are addressed by Model Rule 1.13, Organization as Client, their conduct for purposes of former client conflicts of interest is governed, as is that of all

other lawyers, by Model Rule 1.9. Thus, when a former in-house lawyer is considering whether to represent a client in a matter that is adverse to his former employer, he must determine whether Rule 1.9 applies. [5] Rule 1.9(a) prohibits a lawyer from representing a person whose interests are materially adverse to those of his former employer if he personally represented the former employer in the same or a substantially related matter. Rule 1.9(b) applies this prohibition in situations in which the former in-house lawyer did not personally represent the organization in the same or a substantially related matter, but other lawyers in the legal department did, and the former in-house lawyer acquired protected information [6] during his employment that is material to the prospective client's matter. In contrast to Rule 1.9(b), which only restricts the lawyer in a new matter in which the interests of the client are materially adverse to the former client and the matters are substantially related, Rule 1.9(c) prohibits the use of a former client's protected information (unless it is generally known) as well as its disclosure, even if the lawyer is not adverse to the former client or the adversity is in a matter which is not substantially related to the prior representation.

---

[5] Rule 1.9 states:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter, unless the former client consents after consultation.

(c) A lawyer who has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

[6] The term "protected information" is used in this Opinion to mean "information relating to the representation of a client" that is protected under Rule 1.6.

---

### A. Matters in Which the Lawyer Personally Represented His Former Employer

When in his new employment a former in-house lawyer is sought to be retained by a client for a matter adverse to his former corporate client, the lawyer must ask and answer four questions: (1) whether the lawyer represented his former employer in the matter in question; (2) if so, whether the matter the new client has asked him to undertake is the same matter as, or is substantially related to, the matter in which he represented his former employer; (3) if the matters are either the same or substantially related, whether the interests of his new client are materially adverse to those of his former employer; and (4), if the answers to all of the above questions are yes, whether his former employer has consented to his undertaking the new representation.

### 1. Representation Necessary to Disqualify the Lawyer

Even if the matter involved in the potential conflict was being handled by the legal department of the former employer prior to the in-house lawyer's departure, Rule 1.9(a) does not apply unless the in-house lawyer personally represented the former client. The mere fact that a matter was being dealt with by the legal department while the lawyer was a member of that department does not by itself satisfy the personal representation requirement necessary for Rule 1.9(a) to apply to the subsequent adverse representation. The determination whether a lawyer "represented" his former employer with respect to a matter requires an inquiry into the responsibilities of the lawyer during his former employment. [7] A distinction may be made between a lawyer who has been heavily involved in a matter and one who has been only peripherally involved and has dealt only with issues and not with factual analysis.

---

[7] Many corporate legal departments do not maintain the detailed time records customarily maintained by private law firms. In light of the factual nature of the determination of whether a lawyer "represented" the organization, it is desirable for in-house lawyers to at least to maintain logs describing those matters on which they work.

Moreover, the fact that in-house counsel has had supervisory or administrative responsibilities with respect to a matter that has been handled by his legal department, as frequently occurs when the lawyer is general counsel or legal department head, does not necessarily require a finding that he represented the organization as to that matter. [8] Direct involvement in the matter, or a style of supervision that results in access to material information concerning a matter, must be shown in order to establish that the formerly employed lawyer represented the organization in a specific matter. For example, if the legal department were divided into specialized areas of practice such as tax, patent, and securities law, there would be no presumption that the general counsel has knowledge of any specific matter dealt with by any practice area. Similarly, if the name of the general counsel appears on all pleadings filed by the organization as a matter of general policy, the matter is relatively small or routine, and the legal department is large, the general counsel may not have any familiarity with the matter and should not be viewed as having represented the organization in connection with it unless the rules of practice of the jurisdiction require a contrary conclusion. However, if a matter involved significant litigation and the name of the in-house lawyer appeared on the pleadings, it may be presumed that the lawyer represented the organization in that matter. [9]

---

[8] "Representation" for purposes of Rule 1.9(a) is not defined. Although the Rule itself does not articulate a de minimis exception, some courts have applied one in the process of determining whether a former representation requires disqualification. For example, in *Silver Chrysler Plymouth v. Chrysler Motors Corp.*, 518 F.2d 751, 756 (2d Cir. 1975), the court noted that "there is reason to differentiate for disqualification purposes between lawyers who become heavily involved in the facts of a particular matter and those who enter briefly on the periphery for a limited and specific purpose relating solely to legal questions." A de minimis exception also is available to former government lawyers. Rule 1.11, Successive Government and Private Employment, disqualifies them only if the lawyer "participated personally and substantially" in a matter. Rule 1.11 also expressly permits the former government lawyer's firm to avoid imputed disqualification through a screening procedure in contrast to Rule 1.10, Imputed Disqualification: General Rule, which does not recognize screening as a means to avoid imputed disqualification.

[9] The Committee believes that such a presumption should be rebuttable, however, as for example in jurisdictions where only the individual who personally signs the pleadings is deemed to have made representations concerning them.

---

### 2. Same or Substantially Related Matters

The question whether the former and current matters are the same or substantially related [10] inevitably requires a factual inquiry comparing the two matters. The test developed by the Second Circuit and also applied in some other jurisdictions requires a showing that the relationship between the issues in the prior and present representations is "patently clear" or that the issues are "identical" or "essentially the same." [11] Other cases, relying primarily on the Model Code of Professional Responsibility, add to the factual inquiry the question whether it could reasonably be said that during the former representation the lawyer might have acquired information related to the subject matter of the representation. [12] In so doing, these latter cases conflate two separate issues that are not treated at all in the Model Code and are treated separately in Rule 1.9: disqualification because of former representation and substantial risk of disclosure of protected information. [13]

---

[10] "Substantially related matter" is not defined in the Model Rules and its applicability as developed in case law is fact-specific. For a matter to be substantially related to a matter in which the lawyer represented the former client, it is not sufficient for the matters merely to be problems of a similar type. Comment [2] to Rule 1.9 notes:

> The scope of a "matter" for purposes of this Rule may depend on the facts of a particular situation or transaction. The lawyer's involvement in a matter can also be a question of degree.... [A] lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a wholly distinct problem of that type even though the subsequent representation involves a position adverse to the prior client.

[11] *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739-40 (2d Cir. 1978).

[12] *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 190 (7th Cir. 1979).

[13] Restatement (Third) of the Law Governing Lawyers §213 (Proposed Official Draft 1998), adopts this conflation by defining a matter as "substantially related" if "(1) the current matter involves the work the lawyer performed for the former client; or (2) there is a substantial risk that representation of the present client will involve the use of information acquired in the course of representing the former client, unless that information has become generally known."

### 3. Material Adversity

The Comment to Rule 1.9 indicates that a lawyer must look to Rule 1.7 to determine, upon examination of the specific facts and circumstances of particular representations being handled, whether the interests of the parties are materially adverse. [14] The Comment to Rule 1.7 in turn interprets that Rule to prohibit the representation of interests that are "directly" as opposed to "generally" adverse. The Committee is of the opinion that only direct adversity of interests meets the threshold "material adversity" sufficient to trigger the prohibitions established in Rule 1.9. When an examination of the circumstances of the two conflicting representations reveals direct adversity that is material to the new matter, the lawyer must determine whether it is permissible to seek the consent of one or both clients before he undertakes the new representation.

---

[14] Comment [1] to Model Rule 1.9 provides: "The principles in Rule 1.7 determine whether the interests of the present and former client are adverse."

---

### 4. Consent Required

Both paragraphs (a) and (b) of Rule 1.9 provide for former client consent to a lawyer's subsequent adverse representation. [15] Thus, the organization that had employed the lawyer as in-house counsel may grant its consent to his subsequent representation of a party whose interests are adverse to the organization. For example, the former employer may determine that giving consent to a conflicting representation by its former in-house counsel or his new law firm might be in its best interest where, in the midst of protracted litigation or negotiation, it will avoid the need for substitution of new counsel and its attendant delay by doing so.

---

[15] Although it may be more difficult to obtain binding consent if it applies to future conflicts, see ABA Formal Opinion 93-372, the Committee believes that the nature of the likely conflicts a former in-house counsel might have in subsequent private practice ordinarily are sufficiently well-defined so that the organization's consent to future conflicts should be binding upon it.

---

Consent by the former employer alone, however, may not be sufficient to permit the subsequent representation. Consent by the new client may be required as well, under Rule 1.7(b), if the former in-house lawyer's obligations to his former employer create a material limitation on his representation of the new client, such as when the former employer insists that protected information obtained earlier that is material to the new representation cannot be used. In such a circumstance, the new client, precluded from knowing the nature of the information that is being withheld and unused, may be unable effectively to grant consent to the representation.

However, despite such inability of a former in-house counsel to disclose the protected information as part of the information communicated in order to obtain consent, the Committee believes that circumstances nevertheless may exist in which the client of the new firm may possess sufficient sophistication to consent. Thus, an organization represented by the former in-house lawyer's new firm should, through its general counsel, be able to give consent knowing only that there is protected information that is not being used in the representation. It might be more difficult to obtain consent of an individual client of the new firm who lacks sophistication or legal training sufficient to appreciate the significance of providing consent without knowledge of the protected information. Even then it may be possible to resolve this problem by having independent counsel advise the individual client with respect to the requested consent.

### B. Matters in Which Others in the Lawyer's Legal Department Represented the Former Employer

Even if a former in-house lawyer did not represent his former employer in the same or a substantially related matter in which a new client is materially adverse, he still may be disqualified from representing the new client if he acquired protected information that is material to the new matter he wishes to undertake. Depending on the size and structure of the legal department and the extent to which it limits access to confidential information to those lawyers working on a matter, the lawyer may have obtained information as the result of shared confidences, requiring disqualification under Rule 1.9(b).

Courts have, however, diverged on the question of what types of information are protected. Although some courts have continued to consider a general knowledge of the client's organization, practices and strategy to constitute protected information, [16] others have rejected that concept. [17] These two seemingly inconsistent lines of cases emphasize that the decision whether the lawyer has protected information depends on the facts and circumstances of each particular case.

---

[16] See, e.g., Webb v. E.I. DuPont de Nemours & Company, Inc., 811 F. Supp. 158, 160-63 (D. Del. 1992) (lawyer who had been responsible for ERISA benefit matters for three years

prior to retirement disqualified in suit claiming right to ERISA benefits); Ullrich v. Hearst Corp., 809 F. Supp. 229, 232-36 (S.D.N.Y. 1992) (lawyer who had represented a corporate client in employment discrimination matters for twenty years disqualified from representing plaintiffs in employment discrimination suits because of knowledge gained of personnel data in prior representations). In *Chugach Elec. Ass'n v. U. S. Dist. Court for Dist. of Alaska at Anchorage*, 370 F.2d 441, 443, (9th Cir. 1966), *cert. denied sub nom.*, Roderick v. Chugach Elec. Ass'n, 389 U.S. 820 (1967), a former general counsel was disqualified because his prior position bestowed upon him special "insight" into corporate affairs that gave him the advantage of knowing what questions to ask and of whom. *But see* G.C. Hazard and W.W. Hodes, The Law of Lawyering 296.4 (2d ed. Supp. 1998) with respect to this case: "It is also doubtful whether many courts, including the Ninth Circuit, would today take such a broad view of 'relatedness' in the disqualification context."

[17] *See, e.g.,* Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 646 F.2d 1020, 1027-32 (5th Cir.), *cert. denied*, 454 U.S. 895 (1981) (refusal to disqualify lawyer who brought a "churning" case against a firm he previously had defended on similar charges, since what constitutes churning is fact-specific); Guzewicz v. Eberle, 953 F. Supp. 108, 111-14 (E.D. Pa. 1997) (former general counsel permitted to represent plaintiffs in a discrimination suit where the claim did not involve matters with which the general counsel directly was involved).

*Imputed Disqualification of Others in the Lawyer's New Firm*

If the former in-house lawyer is personally disqualified from representing a client in his new firm by virtue of Rule 1.9(a) or (b), the new firm must consider whether the disqualification will be imputed to other lawyers in the firm. Under Rule 1.10(a), disqualification of a personally disqualified lawyer extends to all lawyers in the lawyer's new firm [18] unless the former client, in this case the employer, consents. [19]

[18] The Committee notes that Comment [10] to Rule 1.9 may be interpreted as supporting the proposition that a lawyer who has represented a client but has not obtained confidential information protected by Rule 1.9(b) may move to a new firm that is adverse to that client in the same matter without the lawyer's new firm being disqualified. Such an interpretation would be inconsistent with Rule 1.10(a), which, in imputing an individual lawyer's personal disqualification to a firm, makes no distinction between disqualification arising under Rule 1.9(a) or (b). To the extent that Comment [10] to Rule 1.9 and Rule 1.10(a) are inconsistent, the Rule governs.

[19] If the basis for the disqualification is that the former in-house lawyer received material confidential information rather than that he personally represented the former employer within the meaning of Rule 1.9(a), in some jurisdictions it nevertheless may be possible to satisfy the requirements of paragraphs (b) and (c) and thereby avoid the prohibition of Rule 1.10 through screening the former in-house lawyer. *See Rule 1.10, Legal Background, Screening To Avoid Disqualification*, in Annotated Model Rules of Professional Conduct 173-75 (3d ed. 1996).

*Conclusion*

A former in-house lawyer may, without obtaining consent from the former client, represent a client in a matter that is materially adverse to the lawyer's former employer unless during the course of the lawyer's employment by the organization either the lawyer personally had represented the employer in the same matter or in a substantially related matter or another member of the organization's legal department had done so and the former in-house lawyer had acquired protected information material to the new matter.

The fact that the lawyer had represented his former employer in similar types of matters or that the lawyer had gained a general knowledge of the strategies, policies, or personnel of the former employer is not sufficient by itself to establish a substantial relationship between the current matter and matters in the legal department at the organization for purposes of Rule 1.9(a). Moreover, general supervisory responsibility such as that exercised by the head of a legal department ordinarily is not by itself sufficient to establish that a lawyer represented his former employer in a particular matter even if it is the same as or substantially related to a matter at the new firm.

The Committee nevertheless is of the opinion that an in-house lawyer may, in the course of his employment as in-house counsel, gain such sensitive information concerning matters in which the legal department represented the organization that is material to the subsequent representation as to be disqualified from subsequent representation under Rules 1.9(a) or 1.9(b) or prohibited from disclosing that information under Rule 1.9(c).

ABA Formal Opinions

Formal opinions are issued by the ABA Standing Committee on Ethics and Professional Responsibility. They appear here in full text and are copyrighted by the ABA.

Contact us at http://www.bna.com/contact/index.html or call 1-800-372-1033

ISSN 1545-9845
Copyright © 2010, by the American Bar Association and The Bureau of National Affairs, Inc.
Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is
prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V

**ABA/BNA**
**ABA Lawyers' Manual on Professional Conduct**

Source:  ABA Ethics Opinions > ABA Formal Ethics Opinions > Formal Opinion 05-436 May 11, 2005

**Formal Opinion 05-436**
**May 11, 2005**

### Informed Consent to Future Conflicts of Interest; Withdrawal of Formal Opinion 93-372

*The Model Rules contemplate that a lawyer in appropriate circumstances may obtain the effective informed consent of a client to future conflicts of interest. General and open-ended consent is more likely to be effective when given by a client that is an experienced user of legal services, particularly if, for example, the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation. Rule 1.7, as amended in February 2002, permits a lawyer to obtain effective informed consent to a wider range of future conflicts than would have been possible under the Model Rules prior to their amendment. Formal Opinion 93-372 (Waiver of Future Conflicts of Interest)* [1] *therefore is withdrawn.*

---

[1] ABA Formal Opinion 93-372 (April 16, 1993), in Formal and Informal Ethics Opinions 1983-1998 167 (ABA 2000).

---

This opinion applies the ABA Model Rules of Professional Conduct [2] to the subject of a lawyer obtaining a client's informed consent to future conflicts of interest. The Committee concludes, for the reasons discussed below, that ABA Model Rule of Professional Conduct 1.7 permits effective informed consent to a wider range of future conflicts than would have been possible under the Model Rules prior to their amendment.

---

[2] This opinion is based on the Model Rules of Professional Conduct as amended by the American Bar Association House of Delegates through August 2003. The laws, court rules, regulations, rules of professional conduct, and opinions promulgated in the individual jurisdictions are controlling.

---

#### Model Rules 1.7, 1.6, and 1.9

Rule 1.7 addresses concurrent conflicts of interest and the circumstances in which a lawyer may, with the informed consent of each affected client, represent a client notwithstanding a concurrent conflict. Rule 1.6, regarding confidentiality of information, and Rule 1.9, regarding duties to former clients, are relevant with respect to the confidentiality issues relating to obtaining such consent.

In 1993, when the Committee issued Opinion 93-372, the Model Rules did not expressly address a client's giving informed consent to future conflicts of interest. Moreover, no Rule or Comment [3] provided express guidance as to when an earlier matter for a former client and a later matter for a different client should be considered substantially related. In 2002, that changed in both respects.

---

[3] "The Comment accompanying each Rule explains and illustrates the meaning and purpose of the Rule…. The Comments are intended as guides to interpretation, but the text of each Rule is authoritative." Model Rules of Professional Conduct Preamble: A Lawyer's Responsibilities cmt. 21.

---

In February 2002, Model Rule 1.7 was restructured and revised. Rule 1.7(a) defines a "concurrent conflict of interest." [4] Rule 1.7(b) addresses the circumstances under which a lawyer may undertake or continue representation of a client in reliance upon the client's informed consent to a conflict:

---

[4] What constitutes a conflict of interest is beyond the scope of this opinion.

---

Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

The Comments to Model Rule 1.7 were also revised. New Comment [22] expressly addresses the subject of a client's giving informed consent to future conflicts:

Whether a lawyer may properly request a client to waive conflicts that might arise in the future is subject to the test of paragraph (b) [of Model Rule 1.7]. The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably likely that the client will have understood the material risks involved. On the other hand, if the client is an experienced user of the legal services involved and is reasonably informed regarding the risk that a conflict may arise, such consent is more likely to be effective, particularly if, e.g., the client is independently represented by other counsel in giving consent and the consent is limited to future conflicts unrelated to the subject of the representation. In any case, advance consent cannot be effective if circumstances that materialize in the future are such as would make the conflict nonconsentable under paragraph (b).

The Committee believes that the term "waiver," as used in the first part of Comment [22], is intended to mean the same thing as the term "informed consent," as used in Rule 1.7 and elsewhere in the Comments.

We interpret the meaning of the term "unrelated to the subject of the representation" in Comment [22] by referring to Comment [3] to Model Rule 1.9, also added in February 2002. Comment [3] provides guidance on when an earlier matter for a former client and a later matter for a different client are to be considered "substantially related." The Comment, which is lengthy, begins with the general principle that "[m]atters are 'substantially related' for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." We are of the opinion, therefore, that the term "unrelated to" as used in Comment [22] should be read as meaning not "substantially related to," as that term is used in Rule 1.9 and its Comment [3], i.e., that the future matters as to which the client's consent to the lawyer's conflicting representation is sought do not involve the same transaction or legal dispute that is the subject of the lawyer's present representation of the consenting client, and are not of such a nature that the disclosure or use by the lawyer of information relating to the representation of the consenting client would materially advance the position of the future clients.

## Opinion 93-372

As noted above, when the Committee issued Opinion 93-372 no Model Rule or Comment expressly addressed informed consent to future conflicts of interest, and none provided express guidance on when successive matters for different clients are to be considered substantially related. Opinion 93-372 cites Model Rules 1.7 and 1.6, Disciplinary Rule 5-105(c) of the predecessor Model Code of Professional Responsibility, and authorities that pre-date (with the exception of one decision) the Model Rules. Opinion 93-372 does not cite Model Rule 1.9.

Opinion 93-372 concludes that the effectiveness of a client's "consent after consultation" [5] is generally limited to circumstances in which the lawyer is able to and does identify the potential party or class of parties that may be represented in the future matter(s). Opinion 93-372 also concludes that, in some instances, the lawyer may need to identify the nature of the likely future matter(s). Although Opinion 93-372 acknowledges that clients differ in their level of sophistication, the opinion does not vary its conclusions as to the likely effectiveness of informed consent to future conflicts when the client is an experienced user of legal services or has had the opportunity to be represented by independent counsel in relation to such consent. Also, although Opinion 93-372 is based to a considerable degree on concerns about the possibility of disclosure or use of the client's confidential information against it in a later matter, [6] it does not address those concerns in the context of the lawyer's seeking informed consent that is limited to future matters that are not substantially related to the client's matter. An informed consent that is limited to future matters that are not substantially related should not raise the concerns regarding the disclosure and use of confidential information that were among the central considerations underlying Opinion 93-372, given the criteria, discussed earlier, for determining whether successive matters are substantially related.

[5] In 2002, as a result of a recommendation by the ABA Commission on Evaluation of the Rules of Professional Conduct, the term "consent after consultation" was replaced in the Model Rules with the term "informed consent." No change in the meaning of the term as it is used in Rule 1.7 and in other affected Rules was intended by this amendment. *See* "Model Rule 1.0, Reporter's Explanation of Changes" ¶5, available at http://www.abanet.org/cpr/e2k-rule10rem.html.

[6] Opinion 93-372 stated that consent to waive a future conflict of interest does not have the effect of authorizing the lawyer to reveal or use confidential client information. *See* Formal and Informal Ethics Opinions 1983-1998 at 171-73. That remains the case. *See also* Rules 1.6(a) and 1.9(b)(2) and (c)(1). Opinion 93-372's reliance on confidentiality concerns as a basis for limiting the scope of the effectiveness of consent to future conflicts seemed to be based on the risk that the lawyer later may violate Rules 1.6 or 1.9. The Committee does not view the hypothetical risk that the lawyer might violate the Model Rules as a sufficient basis for proscribing the sort of informed consent to future conflicts contemplated by Rule 1.7 cmt. 22.

Comment [22] supports a lawyer's seeking, and the effectiveness of, a client's informed consent to future conflicts of interest in the circumstances that are acknowledged by Opinion 93-372. The Comment goes further, however, by supporting the likely validity of an "open-ended" informed consent if the client is an experienced user of legal services, particularly if, for example, the client has had the opportunity to be represented by independent counsel in relation to such consent and the consent is limited to matters not substantially related to the subject of the prior representation. Thus, Opinion 93-372 is no longer consistent with the Model Rules. [7]

[7] Opinion 93-372's limitation of the scope of effective consent to future conflicts, which is its central conclusion, is inconsistent with the amended Model Rules. Hence, we withdraw Opinion 93-372 in its entirety. The Committee notes that other conclusions in Opinion 93-372 on related points are consistent in whole or in part with the Model Rules as amended; those other conclusions are incorporated in this opinion.

### Additional Limitations and Requirements

The Committee notes the following additional limitations and requirements relating to a client's giving informed consent to a future conflict of interest. First, under Rule 1.7(b)(2) and (3), some conflicts are not consentable. [8] An informed consent to a future conflict (like an informed consent to a current conflict) cannot alter that circumstance. Second, under Rule 1.7(b)(4), the client's informed consent must be confirmed in writing. Third, as noted earlier, a client's informed consent to a future conflict, without more, does not constitute the client's informed consent to the disclosure or use of the client's confidential information against the client. Finally, a lawyer, when considering taking on a later matter covered by an informed consent given in advance, even if the conflict is consentable, still must determine whether accepting the engagement is impermissible for any other reason under Rules 1.7(b) and 1.9, or any other Model Rule. The lawyer also must determine whether informed consent is required from the client that is to be represented in that later matter.

[8] *See also* Model Rule 1.7 cmts. 14 to 17.

#### ABA Formal Opinions

Formal opinions are issued by the ABA Standing Committee on Ethics and Professional Responsibility. They appear here in full text and are copyrighted by the ABA.

Contact us at http://www.bna.com/contact/index.html or call 1-800-372-1033

ISSN 1545-9845

Copyright © 2010, by the American Bar Association and The Bureau of National Affairs, Inc. Reproduction or redistribution, in whole or in part, and in any form, without express written permission, is prohibited except as permitted by the BNA Copyright Policy. http://www.bna.com/corp/index.html#V



**Informal Opinion:** 2064
**Year Issued:** 2004
**RPC(s):** RPC 1.7
**Subject:** Advance waiver of conflicts of interest

Question Presented:
The inquirer has provided a copy of an "advance conflicts waiver" form and asks whether or not (1) the Bar has taken any position with regard to such advance waivers and (2) whether it would be appropriate to include the same in the firm's standard fee agreement. The form provided reads as follows:

"As we have discussed, this firm represents many other companies and individuals. It is possible that during the time we are representing you, some of our current or future clients will have disputes or transactions with you. . . . You agree that we may continue to represent, or undertake in the future to represent, existing or new clients in any matter, including litigation, even if the interests of such other clients in such other matters are directly adverse to yours, so long as those matters are not substantially related to our work for you."

Response:
In regard to your inquiry, the Board of Governors has not taken any position with regard to promulgating a form related to advance waiver of conflicts.

With regard to the form you present, the Committee offers no opinion as to what you should or should not include in your standard fee agreement.

With regard to conflicts, RPC 1.7 provides in part as follows:

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) The lawyer reasonably believes the representation will not be adversely affected; and
(2) The client consents in writing after consultation and a full disclosure of the material facts (following authorization from the other client to make such a disclosure). When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

While the "advance waiver of conflict" form you present would appear on its surface to encompass some of the provisions of RPC 1.7, the advance waiver is by no means dispositive of all potential conflicts. For example, under RPC 1.7, the lawyer must make a judgment that the representation being undertaken "will not be adversely affected". This responsibility on the lawyer cannot be waived in advance and the lawyer must continuously assess his representation of clients with potentially conflicted interests.

Second, RPC 1.7 requires a written consent (which the advance conflict waiver seeks to address) but also requires that such waiver in writing be "after consultation and a full disclosure of the material facts". Such an informed consent cannot, we believe, be obviated by an advance waiver form.

While there is nothing to suggest that the use of such a form in a standard fee agreement is violative of the RPC's in any way, attorneys using such a form should be cautious and not be lulled into an assumption that such an advance waiver resolves all the potential issues under RPC 1.7. It should also be noted that some conflicts simply cannot be waived. We refer the inquirer to RPC 2.2 as well as 1.7. There is also valuable discussion on this point to be found in the WSBA Deskbook "Conflicts of Interest in Business Law" at §3.2.

Analysis:
There is a section in the "Deskbook" relating to ethics that comments on "advance waivers". The reasoning therein is fairly clearly stated at §3.2(c):

"(c) Advance consent
"Lawyers should consider, in the proper circumstances, seeking advance consent from clients or prospective clients. "Advance consent" is consent to particular conflicts that do not exist at present but may arise in the future. For example, a lawyer might condition his willingness to serve as tax counsel on an isolated matter for Bank X to the agreement of Bank X that the lawyer and the lawyer's firm may represent specific borrowers in lending transactions with Bank X in the future.

"There is some debate on the efficacy of advance consent. The ABA Committee, in Formal Opinion 93-372, concluded that advance consent was permitted under the Model Rules but expressed a "guarded view." The Committee's concern was whether the client was truly informed.

"Informed consent by the client is as necessary for effectiveness of a prospective waiver as for a contemporaneous waiver, but in the nature of things the consent is much less likely to be fully informed. Given the importance that the Model Rules place on the ability of the client to appreciate the significance of the waiver that is being sought, it would be unlikely that a prospective waiver which did not identify either the potential opposing party or at least a class of potentially conflicting clients would survive scrutiny. Even that information might not be enough if the nature of the likely matter and its potential effect on the client were not also appreciated by the client at the time the prospective waiver was sought.

"Keep in mind that an advance consent ideally should address both current client conflicts under rule 1.7 and potential former client conflicts under rule 1.9. Again, the level of sophistication of the client should have direct bearing on whether the consent sought was sufficiently informed.

"In addition, the nature and scope of the consent must be clearly set forth. As the ABA Opinion noted:

"For example, a prospective waiver from a client bank allowing its lawyer to represent future borrowers of the bank could not reasonably be viewed as permitting the lawyer to bring a lender-liability or a RICO action against the bank, unless the prospective waiver explicitly identified such drastic claims." ABA Formal Opinion 93-372. See also OSB Legal

Ethics Opinion 1991-122 (re efficacy of prospective waiver).

Informal opinions are provided for the education of the Bar and reflect the opinion of the Rules of Professional Conduct Committee. Informal opinions are provided pursuant to the authorization granted by the Board of Governors, but are not individually approved by the Board and do not reflect the official opinion of the Bar association. Laws other than the Washington State Rules of Professional Conduct may apply to the inquiry. The committee's answer does not include or opine about any other applicable law than the meaning of the Rules of Professional Conduct. Informal opinions are based upon facts of the inquiry as presented to the committee.

**E-filed 04/22/2010**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

OPENWAVE SYSTEMS, INC.,

                Plaintiff,

    v.

724 SOLUTIONS (US) INC, et al.,

                Defendant.

_____/

No. C 09-3511 RS

**ORDER GRANTING MOTION TO
DISQUALIFY COUNSEL**

## I. INTRODUCTION

This motion presents the always sensitive subject of potentially disqualifying a party's chosen counsel. Here, the issue is whether defendants' counsel must exit this case because other attorneys associated with their firm represented plaintiff and its predecessors in connection with several matters between 1999 and 2004. A decision to disqualify counsel, never lightly made, is particularly difficult here, as the circumstances present a close call. That said, taking all relevant considerations into account, the motion must be granted.

## II. BACKGROUND

Plaintiff Openwave Systems, Inc. seeks to disqualify the law firm of Fish & Richardson from representing defendants 724 Solutions (US) Inc. and 724 Solutions Software, Inc. (collectively

United States District Court
For the Northern District of California

"724") in this action, contending that Fish previously represented Openwave in a number of matters

that should be considered "substantially related" to the subject matter of this litigation. In this

action, Openwave asserts infringement by 724 of eight U.S. Patents.   At the most general level, the

patents all describe inventions directed at enabling mobile phone users to access information and

services available over the internet.  Defendant 724 sells software products to operators of mobile

phone networks, to permit those operators to offer internet services to their customers.  Openwave

contends those software products infringe its patents.

Until January of this year, 724 was represented solely by the Sprinkle IP Law Group, P.C.

Apparently in connection with 724's acquisition by Mobixell Networks, Inc., Fish attorney David

Barkan filed a notice of appearance on behalf of 724 on January 19, 2010.  Additional Fish attorneys

subsequently applied for, and were granted, permission to appear *pro hac vice*, and the Sprinkle Law

Group eventually withdrew.

Openwave and its predecessor companies were represented by Fish in a number of patent

prosecutions and other patent matters beginning in late 1999 and continuing until 2004.[1]  The nature

of that work is discussed further below.  When Fish appeared in this action, Openwave demanded

that it voluntarily withdraw.   Fish declined to do so, but did put in place an "ethical wall" to ensure

that its attorneys working on this matter would have no access to any documents or other

information the firm might retain related to its prior representation of Openwave.  Pronouncing such

prophylactic efforts legally and factually insufficient, Openwave filed this motion.[2]

III.  LEGAL STANDARD

A motion to disqualify counsel implicates two competing issues: the client's right to the

attorney of its choice versus the need to maintain ethical standards of professional responsibility.

---

[1]  Openwave's moving papers asserted the attorney client relationship continued until 2007, based on a listing of Fish as counsel for Openwave in a patent application as of February of that year.  Fish has shown that its representation of Openwave actually terminated in 2004, and that Openwave disclaimed any attorney-client relationship with Fish regarding the patent application in 2007.

[2]  Fish retained outside counsel to represent it in opposing this motion.  Fish asserts that its attorneys representing 724 have not reviewed any of the motion materials submitted under seal.

2

*Jessen v. Hartford Cos. Ins. Co.*, 111 Cal.App. 4th 698, 705 (2003). Counsel has an unquestionable duty to its former client to ensure the permanent confidentiality of matters disclosed in the course of any prior representation. *Derivi Construction & Architecture, Inc. v. Wong*, 118 Cal.App. 4th 1268, 1273 (2004). At the same time, a court must be mindful that where there is not a realistic risk of the use of confidential material, a litigant should not seek disqualification of its former counsel solely for the purpose of gaining a tactical advantage. *See Optyl v. Eyewear Fashion International Corp.*, 760 F.2d 1045, 1050 (9th Cir.1985); *City and County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal.4th 839, 851-52 (2006).

Here, the parties are in nominal agreement that the applicable standard for determining whether disqualification is warranted is the "substantial relationship" test.  See *Trone v. Smith*, 621 F.2d 994, 998. (1980). ("[t]he relevant test for disqualification is whether the former representation is 'substantially related' to the current representation.").  As explained by the Ninth Circuit, "Substantiality is present if the factual contexts of the two representations are similar or related." *Id.* While the primary purpose of the substantial relationship test is to preserve the secrets and confidences communicated by a client to a lawyer, it does not require the former client to demonstrate that confidential information *actually* was disclosed.  *Id.* at 999.  Requiring such a showing would imperil the very confidences the rule is intended to protect. *Id.* "The inquiry is for this reason restricted to the scope of the representation engaged in by the attorney." *Id.*

In *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal.App.3d 1445(1991), the court identified three factors to be considered in applying the substantial relationship test: (1) the similarities between the two factual situations, (2) the legal questions posed, and (3) the nature and extent of the attorney's involvement with the cases. *Id.* at 1456.[3] The *Ahmanson* court also explained that,

> courts focus less on the meaning of the words "substantial" and "relationship" and look instead at the practical consequences of the attorney's representation of the former client. The courts ask whether confidential information material to the current

---

[3] District courts addressing disqualification motions commonly rely upon California cases, which apply the same substantial relationship test. See, e.g., *Elan Transdermal Ltd. v. Cygnus Therapeutic Sys.*, 809 F.Supp. 1383 (N.D.Cal.1992); *Huston v. Imperial Credit Commercial Mortgage Investment Corp.*, 179 F.Supp.2d 1157, 1167 (C.D.Cal.2001).

3

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    dispute would normally have been imparted to the attorney by virtue of the nature of the former representation.

2    *Id.* at 1454

3    Fish's opposition to the present motion acknowledges the existence of the substantial

4    relationship test, but presents it as if it were a poor substitute for the showing a party seeking

5    disqualification ordinarily ought to be expected to make. Fish begins by repeatedly asserting in

6    various ways that Openwave failed to show that material confidential information was actually

7    obtained by Fish in the prior representation.[4] That may be so, but "it is well settled that actual

8    possession of confidential information need not be proved to disqualify an attorney from

9    representing the adversary of a former client in litigation against the former client." *Global Van*

10   *Lines*, 144 Cal.App.3d at 489.

11   When Fish's opposition eventually turns to the substantial relationship test, it urges the

12   Court to adopt an articulation of the standard espoused by the Board of Patent Appeals and

13   Interferences in *Anderson v. Eppstein*, 59 U.S.P.Q 2d 1280 (B.P.A.I. 2001). In that action, the

14   Board determined that disqualification was not warranted absent a showing that the patents involved

15   in the successive representation concerned "identical or essentially the same" subject matter. 59

16   U.S.P.Q.2d at 1286. To the extent that *Anderson* creates a higher bar for disqualification than do the

17   Ninth Circuit and California state authorities cited herein, it is not controlling and of little persuasive

18   force. The proper inquiry is, as stated in *Ahmanson*, a practical one. Given what Openwave has

19   established as to the nature and scope of Fish's prior representation, is it reasonable to assume that

20

21   [4] In this vein, Fish argues that it cannot be said to have violated Rule 3-310(E) of the California

22   Rules of Professional Conduct because that rule forbids subsequent adverse representation only
     where the attorney "has obtained" material confidences. Fish asserts the rule does not extend to

23   matters "only substantially related to a prior representation." While it is true that the rule does not
     expressly refer to a substantial relationship between successive matters, the point is that the

24   substantial relationship test is a court-devised means for determining whether or not the attorney
     should be deemed to have obtained material confidences such that the rule would apply to bar the

25   subsequent representation. See *Global Van Lines, Inc. v. Superior Court*, 144 Cal.App.3d 483, 487-

26   488 (1983) (quoting predecessor to Rule 3-310(E) and observing, "[u]nder this rule, the initial
     question is whether the former representation is 'substantially related' to the current

27   representation."); *Fremont Indem. Co. v. Fremont General Corp.*, 143 Cal.App.4th 50, 66-67 (citing
     Rule 3-310(E), followed immediately by explanation that where there is a substantial relationship

28   between matters, possession of material confidences will be presumed).

4

1   confidential information material to the present action would normally have been imparted to Fish

2   in the course of that representation?

3

4                                   IV. DISCUSSION

5       A.   Patent prosecution work

6           Fish attorneys worked on ten patent prosecution matters for Openwave, resulting in the

7   issuance of at least six patents between 2001 and 2004.   Openwave contends that two of these

8   matters have particular relevance to the present case.   First, Openwave states the "Voicemail Agent

9   Patent" matter (which resulted in the issuance of U.S. Patent No.7,286,990) is "closely related" to

10  the issues here because the technology claimed in the '990 patent and the technology presently at

11  issue both enable "mobile subscribers to access information stored on the Internet from mobile

12  phone devices."

13          Second, Openwave contends that Fish's work on the "PIM Sync over the phone" matter is

14  substantially related to this action.   PIM is a generic acronym for "Personal Information Manager."

15  One of the patents-in-suit describes how a cell phone user can manage personal information through

16  a mobile phone.

17          The difficulty in evaluating the sufficiency of either of these matters as a basis for possible

18  disqualification, however, is that Openwave has done little to establish that the inventions involved

19  in the successive representations are so interconnected that "confidential information material to the

20  current dispute would normally have been imparted" to Fish in the course of its patent prosecution

21  work.   Conversely, by focusing on an untenable standard that the patents involved be "identical or

22  essentially the same," Fish's opposition sheds little light on whether these matters might ultimately

23  have nothing of substance in common, beyond relating to the same *general* field of technology.

24          It is reasonable to infer that the technology for enabling internet use via mobile phone has

25  been rapidly evolving over the years and that it has presented any number of technical problems to

26  be solved, with each new stage in mobile phone evolution or enhancements in internet capabilities

27  bringing new challenges and opportunities for connecting between the two.   Against that backdrop,

28  it seems entirely possible that even assuming Fish attorneys became intimately acquainted with

United States District Court
For the Northern District of California

5

1 Openwave's confidential information regarding some particular aspect of internet-mobile phone-

2 connectivity technology, such information might be wholly immaterial to the issues in this action.

3 See *Microsoft Corp. v. Commonwealth Scientific & Indust. Research Org.*, 2007 WL 4376104

4 (E.D.Tex. 2007) (in action for infringement of patent allegedly covering the industry standard for

5 wireless LAN, assertion that a law firm previously prosecuted nine patents that "involved wireless

6 LAN technologies" insufficient to support disqualification.).

7      That said, Openwave appears to have made at least some showing that these particular patent

8 prosecutions and the issues in the current dispute have a relationship going beyond simply

9 occupying the same general technological field. A reasonable assumption is that Fish attorneys

10 working on these matters became fully versed in Openwave's then–existing technologies and

11 strategies for "voicemail agents" and "PIM sync," including information that was never

12 subsequently disclosed in any patent applications. The critical question, then, is whether it is

13 reasonable to assume that such information could be *material* to this action. As in *Microsoft*, the

14 fact that the burden is on the party seeking disqualification is dispositive. Openwave has simply

15 failed to show as a factual matter that the technological subject matter of the prior representation

16 supports a reasonable inference that confidential information material to this action would normally

17 have been imparted to Fish during that representation. Accordingly, the patent prosecution work

18 Fish did for Openwave does not serve as a basis for disqualification here.

19

20      B. Patent Opposition Work

21      Beginning in 2000, Fish attorneys represented Openwave in opposing two Australian patent

22 applications, one filed by Motorola, and one by Infogear. At to the Motorola application, at least,

23 there is little question that the patent Motorola was seeking is highly relevant to this case. Its U.S.

24 counterpart, sharing the same specification, issued as U.S. Patent 6,049,821 and formed the basis for

25 an obviousness rejection of some claims of one of the patents-in-suit during prosecution. It appears

26 likely that 724 will rely on the Motorola '821 patent to support an invalidity argument in this action.

27 Thus, putting aside Fish's untenable argument that the two matters would have to be "identical or

28 essentially the same," there would appear to be a significant relationship between the Motorola, and

6

United States District Court
For the Northern District of California

1  perhaps Infogear, matters and this case. Whether there is a "substantial relationship" for purposes of

2  disqualification analysis, however, is a different and more difficult question.

3      As Fish suggests, the task at hand is to construct the set of information that its lawyers

4  reasonably could have been presumed to have obtained to carry out the assignment, and then to

5  determine whether anything within that construct constitutes confidential information material to the

6  present litigation. Fish argues that because its assignment in these matters was to *oppose* issuance

7  of the patents, there is no reason to presume it did anything beyond marshalling (with the help of

8  Australian counsel) arguments and prior art to be used against the applications. At least in the

9  abstract, Fish's argument has considerable appeal. Unlike patent prosecution work, and unlike the

10 majority of legal tasks attorneys undertake for clients, opposing a patent application does not

11 *require* the attorney to know *anything* about the client. Indeed, apart from any ethical

12 considerations or fee agreement issues, there would be no reason a client could not hire a law firm to

13 oppose a patent application through an anonymous phone call.

14     The relevant construct, however, is not what information the Fish lawyers minimally would

15 have needed to carry out their assignment *in theory*, but what information would normally have

16 been imparted to them under the facts of the *actual* lawyer-client relationship shown by the record.

17 In that regard, Openwave has submitted declarations from its chief technology officer and from its

18 in-house patent counsel at the time describing relatively extensive discussions they had with Fish

19 attorneys regarding the technology at issue and Openwave's interests in opposing the Motorola

20 application. Fish billing records also substantiate that there was more communication between

21 attorneys and client than a simple instruction from Openwave to oppose the patent application and a

22 report back from Fish of the public information it had gathered in doing so.

23     Fish argues Openwave's showing is nevertheless insufficient for several reasons. First, Fish

24 contends that even to the extent Openwave stated its reasons for wanting to oppose the Motorola

25 application, such information is not material here, and is obvious in any event. While that may well

26 be, it is not dispositive, because there is no indication that the information disclosed to Fish was

27 limited to the reasons Openwave was concerned about the Motorola application. Next, Fish faults

28 the declarations for couching the factual assertions in terms of what "likely" was discussed. The

7

1   conditional language precludes a conclusion that Openwave has shown *actual* transmission of

2   material confidences, but again, the substantial relationship test does not require such a showing.

3   Because the test focuses on what "normally" would have been imparted given the nature of the

4   representation, the declaratory evidence as to what "likely" was said is highly probative on the

5   question.

6          Finally, Fish contends, in essence, that the evidence is simply too vague to permit an

7   inference that its lawyers obtained material confidences. To be sure, discussions between the

8   lawyers and the client regarding the "technology" could involve no confidences at all, particularly if

9   the focus was on *Motorola's* technology rather than that of Openwave. In essence, however, Fish is

10  asking the Court to engage in the very type of speculation and line-drawing the substantial

11  relationship test is designed to avoid. See *Global Van Lines, Inc. v. Superior Court* 144 Cal.App.3d

12  483, 489 (1983) (presumption of the substantial relationship test is necessary to avoid an attorney

13  engaging "in a subtle evaluation of the extent to which he acquired relevant information in the first

14  representation and of the actual use of that knowledge and information in the subsequent

15  representation."). To posit overly restrictive limitations on what it is reasonable to assume is

16  communicated between lawyers and their clients does not give adequate recognition to the fact that

17  clients should not be expected to limit themselves to giving their attorneys only the information

18  most relevant or critical to a particular engagement. Indeed, because clients often will not know

19  what is or is not strictly relevant, it is likely that they frequently provide attorneys with far more

20  than the bare minimum the attorneys need to carry out the assignment.[5]

21         Fish lays great emphasis on cases that have characterized information as "material" for

22  purposes of disqualification only if it is "directly at issue in, or ha[s] some critical importance to, the

23  second representation." *Farris v. Fireman's Fund Ins. Co.*, 119 Cal.App.4th 671, 680 (2004);

24  *Fremont Indem. Co. v. Fremont General Corp.*, 143 Cal.App.4th 50; 69 (2006). To the extent that

25  Fish suggests generalized information it may have gleaned regarding Openwave's approach to

26

---

27  [5] Undoubtedly there are some clients for whom the reverse is true, and who make it very difficult
    for counsel to gather all the needed information. The point remains, though, that it is not realistic to
28  assume that lawyers and their clients never discuss more than what is technically necessary.

8

United States District Court
For the Northern District of California

1  patent issues, interests in opposing the Motorola application, and the like, would not support

2  disqualification, it likely is correct. The construct, however, is that given the record as to the nature

3  of the prior representation, it is reasonable to assume that Openwave would have normally imparted

4  confidential information to Fish that will be *directly* at issue in this action, given the role the

5  Motorola patent played in the prosecution history of a patent-in-suit and the role it is expected to

6  play in the battle over validity.

7         Finally, after the hearing, a California appellate court issued *Kirk v. First American Title*

8  *Insurance Company*, No. B218956, 2010 WL 1346403 (Cal. App. 2 Dist. Apr. 17, 2010), and the

9  parties have provided supplemental briefing regarding that case. Fish urges that the central teaching

10  of *Kirk* is that the disqualification rules are to be applied with "common sense," and that where there

11  is no "genuine likelihood" of a former client's confidences being used against it, disqualification is

12  not required. *Kirk* arguably broke new ground among California courts for unambiguously

13  approving for the first time the notion that an "ethical wall" *may* be sufficient to prevent imputed

14  disqualification of a firm when it hires an attorney "tainted" by prior representation of a party

15  adverse to a firm client. This Court would have to break far more new ground, however, to

16  disregard its conclusion that there is a substantial relationship between the Motorola opposition and

17  this action, and not disqualify Fish under the facts here.[6]

18         As Openwave points out, this is not a situation where Fish hired, but immediately walled-off,

19  a "tainted" attorney—the conflict already existed within Fish when it accepted the engagement. Nor

20  was the ethical wall erected at all until after Openwave complained. Additionally, although it

21  _____

22  [6] Openwave argues *Kirk* is of little import because it is a non-final decision of an appellate court
that may or may not portend what the California Supreme Court will declare the law of California to
23  be. Although federal courts in this state look to the California rules and decisions in deciding
disqualification motions, it is not the same situation as when a federal court is asked to apply state
24  law in a diversity case. As the California courts long ago recognized, "[t]he federal courts are
governed entirely by federal enactment and their own rules as to admission and professional
25  conduct." *Ex parte McCue*, 211 Cal. 57, 66 (1930). While the Court has elected to hold the
members of its bar and *pro hac vice* admitees to California State Bar standards, *see* Civil Local Rule
26  11-4(a)(1), it is ultimately up to this Court (and the courts above it), not the California Supreme
Court, to determine what warrants disqualification from representation in this forum. Nevertheless,
27  while the Court would be free to follow *Kirk* notwithstanding its non-final and appellate status,
Openwave's further argument that it is distinguishable is well-taken.
28

1  appears that the attorneys who would be shouldering the primary load during this litigation are

2  geographically isolated from the Fish attorneys who represented Openwave, Fish's local counsel of

3  record is not, and the local office is relatively small.  See *Kirk*, 2010 WL 1346403 at *19, citing

4  *Hitachi, Ltd. v. Tatung Co.*, *supra*, 419 F.Supp.2d at p. 1165 ("Close proximity of attorneys

5  'increases the actual risk of intentional or unintentional disclosure of [client] confidential

6  information.'  In a small practice group, separating the tainted attorney from the case alone might

7  not be sufficient . . . .").

8          Fish has not explained whether its conflict check system failed to detect this issue when it

9  was first asked to become involved in this litigation, or whether it was aware of its prior

10  representation of Openwave but did not believe it to present a conflict.  In either event, Fish's

11  position that there is no disqualifying conflict was not unreasonable, and there are no grounds to

12  conclude that to date any Openwave confidential information has actually been disclosed to the Fish

13  attorneys working on this matter or to defendants.  Nevertheless, on the record here Openwave has

14  carried its burden to demonstrate that the balance between the present clients' right to counsel of

15  their choosing, and the former client's right to be certain that its confidences will be maintained and

16  not used against it, even inadvertently, falls on the side of requiring Fish to withdraw from this

17  action.

18

19

20

21

22

23

24

25

26

27

28

10

App. page 61

## IV.  CONCLUSION

The motion to disqualify is granted.  The hearing dates on any pending discovery motions are vacated.  New counsel will be expected to cooperate in having such motions rescheduled for the earliest practicable dates before the referral magistrate judge. The deadlines set out in the Case Management Scheduling Order entered on March 11, 2010 shall remain in place for now, but defendants will be expected to accommodate any reasonable request from new counsel for a stipulation to extend any or all of those deadlines.

IT IS SO ORDERED.

Dated: 04/22/2010

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

11

App. page 62

# CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to the following:

- **Kevin A. Crass**
  crass@fec.net
- **Nicholas H. Patton**
  nickpatton@texarkanalaw.com
- **Damon Young**
  dyoung@youngpickettlaw.com
- **Steven W. Quattlebaum**
  quattlebaum@qgtb.com
- **Brandon B. Cate**
  bcate@qgtb.com
- **Geoffrey P. Culbertson**
  gpc@texarkanalaw.com
- **Carly Slack Anderson**
  canderson@texarkanalaw.com
- **Kent J. Cooper**
  kcooper@fblawllp.com
- **Adam Vincent Floyd**
  afloyd@fblawllp.com
- **Joseph Daniel Gray**
  jgray@fblawllp.com
- **H. Kenneth Prol**
  kprol@fblawllp.com
- **Timothy Teter**
  tteter@cooley.com
- **Benjamin Damstedt**
  bdamstedt@cooley.com
- **Iain Robert Cunningham**
  icunningham@cooley.com
- **Matthew Jacob Faust**
  mfaust@kenyon.com
- **Michelle Carniaux**
  mcarniaux@kenyon.com
- **Lewis V. Popovski**
  LPopovski@kenyon.com

- **Richard S. Gresalfi**
  RGresalfi@kenyon.com
- **Darin Glasser**
  dglasser@omm.com
- **Ryan Yagura**
  ryagura@omm.com
- **Michael Myers**
  mmyers@omm.com
- **George Riley**
  griley@omm.com
- **Jamie Goss Dempsey**
  jdempsey@qgtb.com
- **Reese Patrick McKnight**
  rmcknight@fblawllp.com
- **Nicholas Alfred Schuneman**
  nschuneman@fblawllp.com
- **Matthew S. Wermager**
  mwermager@fblawllp.com
- **John M. Pickett**
  Jpickett@youngpickettlaw.com
- **Michael J. Smith**
  msmith@fblawllp.com
- **Grant E. Kinsel**
  gkinsel@perkinscoie.com
- **Joseph Hamilton**
  jhamilton@perkinscoie.com
- **Eric David Chan**
  echan@omm.com

/s/ Marshall S. Ney_____
Marshall S. Ney