Grant Kinsel, Bar No. 172407
GKinsel@perkinscoie.com
Joseph Hamilton, Bar No. 211544
JHamilton@perkinscoie.com
Michael Song, Bar No. 243675
MSong@perkinscoie.com
PERKINS COIE LLP
1888 Century Park E., Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Attorneys for Defendants and Counterclaimants
NINTENDO CO., LTD., AND NINTENDO OF AMERICA INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARED MEMORY GRAPHICS LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>APPLE INC.; ET AL.,<br><br>            Defendants. | Case No. 3:10-cv-02475 VRW<br><br>NINTENDO'S NOTICE OF MOTION AND MOTION TO COMPEL SUPPLEMENTAL INFRINGEMENT CONTENTIONS; MEMORANDUM OF POINTS AND AUTHORITIES.<br><br>Date:      December 15, 2010<br>Time:      10:30 a.m.<br>Crt. Rm:    C, 15th Floor<br><br>Mag. Judge E. Chen |
| AND RELATED COUNTERCLAIMS | |

TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................1

FACTS ..................................................................................................................................2

1.  Background on the parties .....................................................................................2
2.  The patents-in-suit relate to a purported improvement in graphics processing..............................................................................................................3
3.  Shared Memory's infringement contentions include claim charts that fail to identify where key limitations can be found in the GameCube and Wii .................................................................................................................4

   A.  Shared Memory's claim charts for the '664 patent do not identify where key limitations can be found in the GameCube or Wii, and do not explain Shared Memory's infringement theories....................................4

      (1)  *The "data distribution bus" limitation* ............................................5
      (2)  *The "selectively distributes," and "fast-and-slow-moving images" limitations*..............................................................................6

   B.  Shared Memory's claim charts for the '279 patent do not identify where key limitations can be found in the GameCube or Wii, and do not explain Shared Memory's infringement theories....................................8

ARGUMENT ........................................................................................................................9

1.  The Patent Local Rules and Rule 11 establish the minimum standards for infringement charts ........................................................................................10
2.  Shared Memory must do more than speculate about the existence of supposed data distribution bus; Shared Memory must identify it..............10
3.  Shared Memory does not disclose its infringement theory for the "selectively distributes," "fast-and-slow-moving-images," or "refresh frequency" limitations .........................................................................................12
4.  Shared Memory is not entitled to discovery from Nintendo .....................13
5.  Courts routinely stay discovery when the patentee fails to comply with local Rule 3-1..................................................................................................15

# TABLE OF AUTHORITIES

Page

**CASES**

*Bender v Infineon Techs. N. Am. Corp.*, No. 09-2112 JW, 2010 WL 964197, at *2
  (N.D. Cal Mar. 16, 2010) ................................................................................................ 11

*Bender v. Freescale Semiconductor, Inc.*, No. 09-1156-PHJ(MEJ), 2010
  WL 1689465, at *2 (N.D. Cal. Apr. 26, 2010) ............................................................... 10

*Bender v. Maxim Integrated Prods., Inc.*, No. 09-01152-SI, 2010
  WL 2991257 (N.D. Cal. July 29, 2010) .............................................................. 11, 14, 15

*Bender v. Micrel Inc.*, No. 09-01144-SI, 2010 WL 520513
  (N.D. Cal. Feb. 6, 2010) ............................................................................................ 13, 15

*Intertrust Techs. Corp. v. Microsoft Corp.*, No. 01-1640-SBA, 2003
  WL 23120174, at *2 (N.D. Cal. Dec. 1, 2003) ............................................................... 10

*Network Caching Tech., LLC v. Novell, Inc.*, No. 01-2079-VRW, 2002
  WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002) ....................................................... 10, 15

**REGULATIONS AND RULES**

**Patent Local Rule 3-1** ................................................................ 1, 9, 10, 11, 12, 14, 15, 16

PLEASE TAKE NOTICE that on December 15, 2010, at 10:30 a.m. in Courtroom C, fifteenth floor, Nintendo will move the Court for an order (1) compelling Shared Memory to supplement its Patent Local Rule 3-1 infringement contentions, and (2) staying discovery.

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

Federal Rule of Civil Procedure 11 requires a patentee to conduct a detailed prefiling investigation. This Court's Patent Local Rules require the patentee to disclose the facts from this investigation in its infringement contentions. And so, before receiving any discovery from the defendant, the rules require that the patentee serve infringement contentions specifically identifying where in the accused devices the allegedly infringing circuitry can be found.

Shared Memory's infringement contentions, by contrast, do not specifically identify where the allegedly infringing circuitry can be found in the accused Nintendo devices—the GameCube and Wii (pronounced "we"). In fact, there will be no meaningful dispute that Shared Memory has not complied with the Patent Local Rules' specificity requirement. Instead, Shared Memory will claim that it has no documents from Nintendo, and, therefore, no ability to be more specific. But this is not an adequate excuse, as this district requires a plaintiff to conduct reverse engineering or its equivalent *before* filing its complaint.

Ironically, Shared Memory claimed, under oath, that it had a "reverse engineering report of the [Wii graphics processor chip] including all portions of the circuitry contained on the chip relevant to this case."[1] But despite this declaration, Shared Memory's infringement contentions rely on vague documents plucked from the internet, combined with speculation that the key limitations "must be there." So, instead of

---

[1] Floyd Decl. at ¶ 6 (Dkt. # 246-2).

relying on its "reverse engineering report," Shared Memory relies on (1) a Power Point slide that does not show any circuitry at all, (2) class notes that a U.C. Santa Cruz assistant professor posted as a teaching aid in an undergraduate computer science class, and (3) a couple of internet news articles bearing no relationship to either accused product or the patents-in-suit.

This Court should compel Shared Memory to amend its infringement contentions to comply with the Patent Local Rules, and until Shared Memory does so, the Court should stay discovery against Nintendo.

## FACTS

**1.   Background on the parties.**

Shared Memory's parent, Acacia, is a publicly traded patent-holding company. Acacia acquires patents, forms subsidiaries to insulate itself from potential liability, and causes its subsidiaries to sue manufacturers for patent infringement. Acacia acquired the patents-in-suit, U.S. Patent Nos. 5,712,664 (the "'664 patent") and 6,081,279 (the "'279 patent"),[2] from Alliance Semiconductor. The patents-in-suit were part of a larger portfolio of distressed patents Acacia purchased from Alliance just before Alliance went out of business. After acquiring the patents-in-suit, Acacia formed Shared Memory, and assigned the patents-in-suit to Shared Memory. Shared Memory's only business is being a plaintiff in this case; it does nothing else.

Nintendo makes and sells video-game systems and software, including the GameCube and Wii. Shared Memory accuses Nintendo's GameCube and Wii of infringing the '664 and '279 patents. Shared Memory also accuses Sony, Apple and Samsung products of infringing the patents-in-suit.

---

[2] The '664 and '279 patents are attached to the Kinsel Decl. as Exs. 10 and 11, respectively.

**2.    The patents-in-suit relate to a purported improvement in graphics processing.**

According to the patents-in-suit, prior art graphics systems had a bandwidth problem. That is, the patents-in-suit state that prior art graphics systems received display data from a computer's central processing unit, processed the data, and wrote the data for display to a frame-buffer memory located in dynamic random access memory ("DRAM") on a separate chip.[3] A "data bus" connected the graphics accelerator to the DRAM memory, allowing data to be transferred to and from those components.[4] This prior art design is shown in figure 1 (right). But according to the patents-in-suit, the bandwidth of the data bus limited system performance.[5]



FIG. 1
(PRIOR ART)

To solve the supposed data-bus-bandwidth problem, the patents divide the frame buffer memory into two parts—one part on the same chip as the graphics accelerator ("on-chip"), and the other not ("off-chip").[6] To communicate with the memory, the patents-in-suit claim a "data *distribution* bus."[7] According to the patents-in-suit, the data distribution bus is used to distribute data between the on-and-off-chip frame buffers.[8] Figure 2 from the patents-in-suit (right) shows the data distribution bus highlighted in blue.



FIG. 2

---

[3] *See* '664 patent at 1:36–57.
[4] *Id.*
[5] *Id.* at 1:57–65.
[6] *Id.* at 2:19–29.
[7] *Id.* at 2:64–3:17, fig. 2 (emphasis added).
[8] *Id.* at 3:12–18.

1  The patents-in-suit include an additional requirement related to the DRAM-frame buffers. DRAM is called *dynamic* random access memory because it needs to be periodically refreshed. DRAM stores data by holding an electric charge. Over time, the charge leaks out. To avoid memory corruption, DRAM must be periodically recharged. This recharge operation is called "refresh."

The '279 patent requires that the on-chip and off-chip frame buffers have different refresh characteristics.[9] Specifically, the on-chip frame buffer must have a higher refresh frequency than the off-chip frame buffer.[10] The '279 patent also requires that this arrangement—higher refresh frequency for on-chip and lower refresh frequency for off-chip—must "reduce on-chip power dissipation."[11]

### 3. Shared Memory's infringement contentions include claim charts that fail to identify where key limitations can be found in the GameCube and Wii.

In October 2010, Shared Memory served infringement contentions that identified the asserted claims as Claim 3 of the '664 patent, and Claims 2, 6, and 8 of the '279 patent. The contentions identified the GameCube and Wii as the allegedly infringing devices. Shared Memory also provided a Rule 3-1(c) claim chart for both devices for each asserted claim. Shared Memory's 3-1(c) claim charts are the subject of this motion.[12]

### A. Shared Memory's claim charts for the '664 patent do not identify where key limitations can be found in the GameCube or Wii, and do not explain Shared Memory's infringement theories.

Shared Memory only asserts Claim 3 of the '664 patent against Nintendo. That claim reads as follows with the limitations at issue in this motion italicized:

---

[9] '279 patent at 4:20-25.
[10] *Id.*
[11] '279 patent at Claim 2.
[12] Shared Memory's 3-1(c) charts ("Charts") are attached to the Kinsel Decl. as Exhibits 1–8.

A shared memory graphics accelerator system that provides graphics display data to a display element for display thereby, the shared memory graphics accelerator system comprising:

a central processing unit that generates graphics display data and graphics commands for processing graphics display data;

an integrated graphics display memory element that includes both a graphics accelerator connected to receive graphics display data and graphics commands from the central processing unit and an on-chip frame buffer memory element connected to receive graphics display data from the graphics accelerator *via a display data distribution bus*; and

an off-chip frame buffer memory element connected to receive graphics display data from the graphics accelerator *via the data distribution bus*;

*wherein the graphics accelerator selectively distributes display data to the on-chip frame buffer memory element and to the off-chip frame buffer memory element based on pre-defined display data distribution criteria, and*

*wherein the display data distribution criteria are predefined such that the graphics accelerator selectively distributes display data corresponding to fast moving images to the on-chip frame buffer memory element and display data corresponding to slowing [sic] moving images of [sic] the off-chip frame buffer memory element.*

(**1**)  *The "display data distribution bus" limitation.*

The "display data distribution bus" limitation requires that the graphics accelerator share data between on-chip and off-chip memories "via the data distribution bus." Shared Memory's only identification of where this limitation can be found in the GameCube is in a Power Point slide that Shared Memory copied from the internet (right).[13] Shared Memory does not identify



---
[13] Charts, Ex. 1 at 9.

1   any particular circuitry meeting the "data distribution bus" limitation. Instead, Shared
2   Memory points to the double-headed arrows in the slide, and speculates that the arrows
3   mean there must be a data distribution bus. In a separate slide (not show), Shared
4   Memory simply states, "the Graphics accelerator (D) contains a bus (F) to eDRAM and
5   off-chip memory."[14]

6   Shared Memory's identification of the data distribution bus limitation in the Wii
7   is similarly vague. Shared Memory's relies exclusively on class notes from a 2009
8   undergraduate course (right).
9   Using these notes to identify the
10  data distribution bus, Shared
11  Memory points to the outline
12  of a box labeled "GPU," and
13  claims that this is the "[b]us to
14  eDRAM and off-chip
15  memories." On a separate page
16  of class notes, Shared Memory
17  highlights the phrase: "3.9



18  GB/s peak bandwidth between Vegas and memory on Napa."[15] Shared Memory claims
19  that this phrase is the data distribution bus.[16] As with the GameCube, Shared Memory
20  identifies no circuitry supposedly satisfying this limitation, how the supposed bus
21  distributes data, or anything else about the allegedly infringing circuitry.

22  (2)   *The "selectively distributes," and "fast-and-slow-moving images" limitations.*
23  The "selectively distributes" limitation requires,

24
25

---

26  [14] *Id*. at 8.
27  [15] Charts, Ex. 5 at 10.
28  [16] *Id*.

> wherein the graphics accelerator selectively distributes display data to the on-chip frame buffer memory element and to the off-chip frame buffer memory element based on pre-defined display data distribution criteria,[17]

The "fast-and-slow-moving-images" limitation requires,

> wherein the display data distribution criteria are predefined such that the graphics accelerator selectively distributes display data corresponding to fast moving images to the on-chip frame buffer memory element and display data corresponding to slowing [sic] moving images of [sic] the off-chip frame buffer memory element.[18]

Shared Memory does not explain its infringement theory for either of these limitations for either the GameCube or Wii. For both the GameCube and Wii, Shared Memory relies on the following observations taken from an internet news source:

> Both internal memory buffers have a sustained latency of under 5 nanoseconds. The frame and z-buffer memory is capable of 9.6 Gbytes/second of bandwidth. The texture buffer boats an even faster bandwidth of 12.8 Gbytes/s.
>
> The GameCube uses 1T-SRAM, this time as 24 Mbytes of external memory. Operating at a 405-MHz clock speed, the memory moves data at 3.2 Gbytes/s, with a sustained latency of 10 ns.[19]

Shared Memory does not link these observations to the claim elements, does not explain how these observations show that the limitations are satisfied, and does not disclose its infringement position based on these observations.[20]

The only additional disclosure Shared Memory makes for the Wii is also based on the class notes described above. Shared Memory highlights a note that claims that the Wii and GameCube have a "similar architecture."[21] Based on this speculation, Shared Memory copies and pastes the two observations described above about the GameCube, into its charts regarding the Wii.[22]

---

[17] '664 patent at 6:41-44.

[18] *Id.*

[19] Charts, Ex. 1 at 14; Charts, Ex. 5 at 20.

[20] Charts, Ex. 1 at 13–18; Charts, Ex. 5 at 20–26.

[21] Charts, Ex. 5 at 18–19.

[22] *Id.* at 20.

**B. Shared Memory's claim charts for the '279 patent do not identify where key limitations can be found in the GameCube or Wii, and do not explain Shared Memory's infringement theories.**

Shared Memory asserts Claims 2, 6 and 8 from the '279 patent against Nintendo. These claims include the "data distribution bus" limitation, and the "selectively distributes" limitation discussed above in sections 3(A)(1) and (2). Shared Memory's claim charts for these limitations are the same for the '664 and '279 patents, and are deficient for the same reasons.

Claim 2 of the '279 patent also includes a limitation similar to the "fast-and-slow-moving-images" limitation discussed in section 3(A)(2) above. Claim 2 requires,

> wherein the display data distribution criteria are predefined such that the graphics accelerator selectively distributes pixel display data corresponding to images requiring a first memory access time to the on-chip frame buffer memory element and pixel display data corresponding to images requiring a second access time slower than the first access time to the off-chip frame buffer memory element.[23]

Shared Memory's disclosure for this limitation is *exactly* the same as its disclosure for the "fast-and-slow-moving-images" limitation. Shared Memory merely copies and pastes its disclosures discussed above in section 3(A)(2) as its disclosures for this limitation.[24]

There are additional limitations in the '279 patent not found in the '664 patent. Specifically, all three asserted claims from the '279 patent require that the refresh frequency for the on-chip frame buffer is higher than the refresh frequency for the off-chip frame buffer to reduce on-chip power dissipation. This limitation is exemplified in Claim 2, which requires:

> wherein a refresh frequency of the on-chip frame buffer memory element is higher than a refresh frequency of the off-chip frame buffer memory element to reduce on-chip power dissipation.[25]

---

[23] '279 patent, Claim 2.

[24] Charts, Ex. 2 at 16–18; Charts, Ex. 5, at 22–26.

[25] '279 patent at 5:60-6:23. See also, *id* at 6:55-7:12, 7:19-8:4.

Shared Memory's *only* disclosure of this limitation, is to lift a quotation from an internet article that has nothing whatsoever to do with either the GameCube or the Wii. Shared Memory relies *exclusively* on the following two sentences:

> The refresh rate for DRAMs depends on the memory vendor and the design technology they use. A typical refresh interval is 64ms. The refresh intervals in embedded DRAMs are an order of magnitude shorter. [26]

But this article was not written about the GameCube or the Wii. Instead, it relates to a proposed enhanced memory controller with nothing whatsoever to do with either device.[27] Shared Memory does not attempt to map any of the statements from this article to any of the components in the GameCube or Wii. Shared Memory does not show any refresh frequency of any kind for any component in the GameCube or the Wii. Shared Memory does not offer any linkage between this article and the requirement that the refresh frequency for the on-chip frame buffer is higher than the refresh frequency for the off-chip frame buffer to *reduce on-chip power dissipation*. In fact, Shared Memory does not use the words "power dissipation" anywhere in its claim charts.

## ARGUMENT

### 1. The Patent Local Rules and Rule 11 establish the minimum standards for infringement charts.

Patent Local Rule 3-1(c) requires a patentee to include in its infringement contentions a chart, "identifying specifically where each limitation of each asserted claim is found within each Accused Instrumentality." As the court noted in *Intertrust Techs. Corp. v. Microsoft Corp.*, the "overriding principle of the Patent Local Rules is that they are designed [to] make the parties more efficient, to streamline the litigation process, and to articulate with specificity the claims and theory of a plaintiff's infringement claims."[28]

---

[26] Charts, Ex 2 at 19-20, Ex. 3 at 16–17, Ex. 4 at 16–17; see also, Charts, Ex. 6 at 27–28, Ex. 7 at 22–23, Ex. 8 at 22–23.

[27] The full article is attached to the Kinsel Decl. as Ex. 9.

[28] No. 01-1640-SBA, 2003 WL 23120174, at *2 (N.D. Cal. Dec. 1, 2003).

1  To make the parties more efficient, the patentee must disclose a minimum level of detail about its infringement theory. As Chief Judge Walker held in *Network Caching Tech., LLC v. Novell, Inc.*, the minimum specificity required by Rule 3-1 is set by Federal Rule of Civil Procedure 11: "[T]he standard of FRCP 11 prefiling inquiry establishes the minimum level of detail that Patent LR 3-1 requires."[29] Chief Judge Walker also held that the minimum level of prefiling investigation required by Rule 11 is "reverse engineering or its equivalent."[30]

### 2. Shared Memory must do more than speculate about the existence of the supposed data distribution bus; Shared Memory must identify it.

Shared Memory fails to identify any specific circuitry as the supposed data distribution bus. Instead, Shared Memory claims that the graphics processor communicates with the supposed on-chip and off-chip memories, and, so, the data distribution bus must be there. Relying on rank it-must-be-there speculation is insufficient under the Patent Local Rules.

Patent Local Rule 3-1(c) requires the patentee to identify "where each limitation . . . is *found*."[31] As the court found in *Bender v. Freescale Semiconductor, Inc.*, the purpose of the infringement contentions is to put the defendant on fair notice as to what the allegedly infringing circuitry is.[32] The requirement forces the patentee to crystallize its infringement theory early in the case and to adhere to that theory once disclosed.[33]

The plaintiff in *Bender v. Maxim Integrated Prods., Inc.*[34] had speculative claim charts much like Shared Memory's claim charts. In that case, Bender's patent included a limitation concerning a "first current rail." Bender's claim chart stated that "[w]ithout

---

[29] No. 01-2079-VRW, 2002 WL 32126128, at *4 (N.D. Cal. Aug. 13, 2002).

[30] *Id.* at *5.

[31] Patent L.R. 3-1(c) (emphasis added).

[32] No. 09-1156-PHJ(MEJ), 2010 WL 1689465, at *2 (N.D. Cal. Apr. 26, 2010).

[33] *Id.*

[34] No. 09-01152-SI, 2010 WL 2991257 (N.D. Cal. July 29, 2010).

1   current rails to provide power to the buffers, the buffers will not function," and that
2   "[t]he current rails are not shown in the datasheet . . . because it is understood that a
3   power source is required."[35]

4   The court held that Bender's charts were insufficiently detailed:

> Plaintiff cannot simply rely on Maxim publicly-available datasheets to diagram his claims, and then attempt to escape his obligation to locate each element of each claim within the accused device by stating that he assumes an element of the claim must be present, although not depicted.[36]

8   The court further found that Bender's "assumptions are insufficient to support
9   plaintiff's obligation under Patent Local Rule 3-1 to provide defendant with 'fair notice
10  as to where the alleged infringing [elements] are located' within the accused products."[37]

11  Like Bender, Shared Memory speculates that the data distribution bus must be
12  there. But this is not enough. Indeed, if Shared Memory is right, and all it needs to do to
13  comply with Rule 3-1(c) is to stumble across some pictures on the internet and speculate
14  based on those pictures that the data distribution bus must be there, then what is the
15  point of the infringement contentions? Shared Memory's current claim charts leave
16  Nintendo in *exactly* the same position it would be without the charts: Nintendo knows
17  that Shared Memory *believes* the data distribution bus is there. What Nintendo doesn't
18  know is what circuitry Shared Memory contends constitutes the data distribution bus. If
19  Shared Memory's infringement claim charts are to have any meaning at all, they must, at
20  a minimum, force Shared Memory to take a position on where this critical circuitry
21  allegedly can be found.

---

[35] *Id.*

[36] *Id.* at *2.

[37] *Id.* (quoting *Bender v Infineon Techs. N. Am. Corp.*, No. 09-2112 JW, 2010 WL 964197 at *2 (N.D. Cal Mar. 16, 2010)).

**3.    Shared Memory does not disclose its infringement theory for the "selectively distributes," "fast-and-slow-moving-images," or "refresh frequency" limitations.**

The "selectively distributes" limitation requires that the "graphics accelerator selectively distributes" display data between the on-chip frame buffer and the off-chip frame buffer.[38] The "fast-and-slow-moving-images" limitation requires that the graphics accelerator selectively distribute fast-moving images to the on-chip frame buffer, and slow-moving images to the off-chip frame buffer.[39] And the "refresh frequency" limitations require (1) that the refresh frequency, as defined by the patent, be higher for the on-chip frame buffer than for the off-chip frame buffer, and (2) this arrangement must "reduce on-chip power dissipation."[40] Shared Memory's infringement charts fail to explain its infringement theory with respect to any of these limitations.

Shared Memory's only identification in its claim charts for the "selectively distributes," and "fast-and-slow-moving-images" limitations is a news article purporting to show how the element Shared Memory claims is the on-chip frame buffer has a "sustained latency of under 5 nanoseconds," and that the element Shared Memory identifies as the off-chip frame buffer has "a sustained latency of 10ns."[41] But this article says nothing whatsoever about how any data is distributed—selectively or otherwise. Nor does it suggest that fast-moving images are selectively distributed to one memory rather than the other. In short, this article does not explain why Shared Memory believes either limitation is satisfied.

Shared Memory's disclosure of the refresh frequency limitation is worse. Shared Memory relies on an excerpt from an article written in 2007 that does not reference the GameCube or the Wii.[42] Nor does Shared Memory even mention the limitation that the

---

[38] '664 patent at 6:41-44.

[39] *Id.*

[40] '279 patent, Claim 2.

[41] Charts, Ex. 1 at 17; Charts, Ex. 5 at 25.

[42] Charts, Ex 8 at 23; Kinsel Decl. at Ex. 9.

1 refresh frequency for the on-chip frame buffer is higher than the refresh frequency for the
2 off-chip frame buffer *to reduce on-chip power dissipation*. Shared Memory simply
3 ignores this limitation as if it did not exist. Shared Memory's claim chart for this
4 limitation, like its chart for the other limitations that are the subject of this motion, is
5 tantamount to no chart at all.

### 4. Shared Memory is not entitled to discovery from Nintendo.

Shared Memory's lack of discovery from Nintendo is not an adequate excuse for its failure to comply with Rule 3-1(c)'s specificity requirement. This court requires a patentee to do reverse engineering or its equivalent *before* filing suit.[43] And so, in this district, lack of discovery does not excuse insufficiently detailed infringement contentions.

Judge Illston faced just this question in *Bender v. Micrel Inc.*[44] In that case, the "Plaintiff . . . made no attempt to identify the precise location within defendant's product where the infringing components are located."[45] But the plaintiff contended that "he [could not] be more specific without obtaining defendant's detailed schematics."[46] Nevertheless, the court held that it would "not permit plaintiff to proceed at this point in the absence of claim charts containing more substantive infringement contentions."[47] Put differently, Bender's lack of the defendant's detailed schematics was no excuse for failing to satisfy Rule 3-1(c).

Shared Memory knows that its lack of Nintendo discovery is not an excuse and that reverse engineering or its equivalent is required. In fact, Shared Memory's lawyers declared—under oath—that they have a reverse engineering report for the Wii (although, apparently, not for the GameCube). That is, Nintendo filed a motion to disqualify

---

[43] *Network Caching*, 2002 WL 32126128, at *7.
[44] No. 09-01144-SI, 2010 WL 520513 (N.D. Cal. Feb. 6, 2010).
[45] *Id.* at *2.
[46] *Id.*
[47] *Id.*

1  Shared Memory's counsel on the grounds of conflicts of interest.[48] In opposition to that
2  motion, Shared Memory's counsel sought to prove that all of its prefiling diligence was
3  based on publicly-available information. Shared Memory's lead counsel declared, "I am
4  prepared to provide a detailed accounting of F&B's pre-filing investigation . . . . Among
5  the items would be a reverse engineering report of the Hollywood chip including *all*
6  *portions of the circuitry* contained on the chip relevant to this case."[49]

7  Yet despite this under-oath statement, Shared Memory's infringement contentions
8  contain no sign of the "reverse engineering report of the Hollywood chip." Rather,
9  Shared Memory relies exclusively on documents it unearthed from the internet. The
10 implication is: (1) the declaration is untrue, and Shared Memory does not have a reverse
11 engineering report; or (2) the report demonstrated that Nintendo's products do not
12 infringe (they do not) and Shared Memory filed this lawsuit anyway. Either way, Shared
13 Memory's lack of Nintendo's documents does not excuse its failure to meet Rule 3-1(c).

**5. Courts routinely stay discovery when the patentee fails to comply with local Rule 3-1.**

16 Where, as here, the patentee does not provide sufficient detail in its infringement
17 charts to satisfy Rule 3-1(c), courts in this district stay discovery. For example, in *Bender*
18 *v. Maxim Integrated Prods., Inc.*, Judge Illston held that the patentee "bears the burden
19 of providing infringement contentions that specify the location of every claim element
20 within the accused products, so that the Court can make a principled decision on
21 whether discovery will proceed."[50] Chief Judge Walker also stayed discovery pending the
22 patentee's compliance with Rule 3-1 in *Network Caching*.[51] Judge Illston stayed
23 discovery again in *Bender v. Micrel, Inc.*[52]

---

[48] Dkt. #200
[49] Floyd Decl. at ¶ 6 (Dtk. #246-2) (emphasis added).
[50] No. 09-01152-SI, 2010 WL 1135762, at *2 (N.D. Cal. March 22, 2010).
[51] *Network Caching*, 2002 WL 32126128, at *7.
[52] No. C-09-01144-SI, 2010 WL 520513, at *2 (N.D. Cal. Feb. 6, 2010).

Given Shared Memory's manifest failure to comply with Rule 3-1, Nintendo should not be obligated to produce any materials to Shared Memory until it is in compliance with the rules.

## CONCLUSION

Shared Memory conducted no meaningful prefiling diligence. Its infringement contentions rely on documents Shared Memory found on the internet, instead of the reverse engineering report it claims to have. As a result, Shared Memory's infringement charts fail to specifically identify where the allegedly infringing components can be found, and fail to specifically disclose its infringement theory. The Court should compel Shared Memory to serve amended infringement charts that meet the specificity requirement in Rule 3-1(c). Also, the Court should stay Nintendo's discovery obligations until Shared Memory provides compliant infringement contentions.

November 2, 2010

PERKINS COIE LLP

By: _____/s/ Grant Kinsel_____
Grant E. Kinsel, Bar No. 172407
GKinsel@perkinscoie.com

Attorneys for NINTENDO CO., LTD
AND NINTENDO OF AMERICA INC.